# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 14-853V**
**Filed: June 9, 2026**

|  |  |
|---|---|
| NORMA MONGE-LANDRY, | Special Master Horner |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Elaine Whitfield Sharp, Whitfield, Sharp & Sharp, Marblehead, MA, for petitioner.*
*Camille Michelle Collett, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION[1]

On September 15, 2014, Norma Monge-Landry ("petitioner") filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that the influenza ("flu") vaccine she received on September 19, 2011, caused her to suffer seronegative rheumatoid arthritis ("RA"). (ECF Nos. 1, 32.) For the reasons discussed below, I now find that petitioner is *not* entitled to compensation.

## I.      Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute;

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table.  In such instances, an alternative means exists to demonstrate entitlement to a Program award.  That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question.  § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii).  In that context, the presumption available under the Vaccine Injury Table is inoperative.  The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question.  *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991).

In this case, petitioner has alleged that flu vaccine caused her to suffer seronegative rheumatoid arthritis ("RA").  Because the alleged injury is not listed on the Vaccine Injury Table relative to the flu vaccine at issue, petitioner must satisfy the below-described *Althen* test for establishing causation-in-fact.

The showing of "causation-in-fact" must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury.  *Althen*, 418 F.3d at 1279.  She need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury."  *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury.  *Id*.

2

A petitioner may not receive a Vaccine Program award based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1). A petitioner may rely upon circumstantial evidence. *See Althen*, 418 F.3d at 1280. Moreover, the *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention, so long as the petitioner supplies the medical opinion of an expert. *Id*. at 1279-80. However, while scientific certainty is not required, that expert's opinion must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1). The special master is required to consider the entirety of the evidentiary record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines*, 940 F.2d at 1528).

## II.    Procedural History

This case had initially been assigned to a different special master. (ECF No. 4.) However, after extensive litigation, the case was eventually reassigned to my docket in February of 2026 following the initially assigned special master's retirement. (ECF Nos. 231-32.)

In September of 2014, petitioner filed medical records marked as Exhibits 1-3. (ECF No. 6.)  Petitioner later filed further medical records marked as Exhibits 4-8.  (ECF Nos. 10, 13, 16, 18, 27.)  In May of 2016, petitioner filed her first expert report by immunologist and rheumatologist Paul J. Utz, M.D., along with accompanying medical literature.  (ECF No. 31; Exs. 9-15.)  Respondent filed his Rule 4(c) report recommending against compensation in November of 2016.  (ECF No. 40.)  At that time, respondent also filed an expert report by immunologist and rheumatologist Mehrdad Matloubian, M.D., Ph.D., and supporting medical literature.  (ECF Nos. 41; Exs. A-B.)[3]  The previous special master then held a status conference and ordered the parties to file supplemental expert reports.  (ECF No. 46.)  In the meantime, petitioner filed additional medical records marked as Exhibits 16-19.  (ECF Nos. 49, 52.)

Petitioner filed a supplemental expert report from Dr. Utz in April of 2017.  (ECF No. 54; Exs. 20-26.)  Respondent then filed a responsive expert report from Dr. Matloubian in September of 2017 and an initial expert report by immunologist J. Lindsay Whitton, M.D., Ph.D., in November of 2017.  (ECF Nos. 72, 75; Exs. C-E.)  Petitioner filed a third report by Dr. Utz in February of 2018.  (ECF No. 76; Exs. 27-32.[4])  A hearing was then set to commence on February 11-12, 2019.  (ECF No. 79.)  Pursuant to the Pre-Hearing Order issued on July 12, 2018, both parties filed pre-hearing briefs, exhibit lists, a joint glossary of terms, and a joint list of hearing attendees.  (ECF Nos. 94, 104, 105, 107, 108, 113.)  Prior to the hearing, petitioner filed affidavits by Jean Marie Landry and Estaban John Monge.  (ECF Nos. 111, 129; Exs. 44, 52.)[5]  Petitioner also filed additional medical literature.  (ECF No. 98; Exs. 35-41.)[6]

The initial two days of the entitlement hearing commenced on February 11, 2019, in Boston, Massachusetts, with petitioner, petitioner's lay witnesses, and Dr. Utz testifying.  (Transcript of Proceeding ("Tr."), at ECF Nos. 134-35.)  However, the hearing failed to conclude within the allotted time and was thus continued on May 21-22, 2019, in San Francisco, California.  (ECF Nos. 125, 132, 157.)  Between the hearing dates, petitioner filed updated medical records.  (ECF Nos. 128, 138, 153; Exs. 47-51, 56-63.)  Both parties also filed additional medical literature.  (ECF Nos. 131, 148; Ex. 55; Ex. F, Tabs 8-10.)

---

[3] Respondent's medical literature accompanying Dr. Matloubian's initial expert report was struck by Order (ECF No. 123) due to filing errors and the exhibits were refiled on February 8, 2019.  (ECF Nos. 115-17; Ex. A, Tabs 1-31).

[4] Dr. Utz's third expert report is mislabeled as Exhibit 17; however, this report will be referenced by Exhibit 27 throughout this decision.

[5] An unsigned version of Mr. Monge's affidavit was initially filed as Exhibit 45.  (ECF No. 112.)  The signed affidavit was subsequently filed as Exhibit 52.  (ECF No. 129.)

[6] Petitioner initially filed this literature with some duplicating exhibit designations (ECF Nos. 95-96); however, when petitioner refiled the exhibits after her initial filings were struck, she then skipped to Exhibit 35, leaving Exhibit designations 33 and 34 unused (ECF No. 98).

The second two-day portion of the entitlement hearing commenced on May 21, 2019.  (Transcript of Proceeding ("Tr."), at ECF Nos. 159-60.)  During the hearing, Dr. Utz referenced two additional medical articles that were subsequently filed on May 28, 2019.  (ECF No. 155; Exs. 64-65.)[7]  The previously presiding special master allowed respondent the opportunity for his experts to respond to those articles by filing supplemental expert reports.  (ECF No. 157.)  The parties were also directed to file a joint post-hearing document that lists the key facts the parties agree upon and an agreement by the experts of "certain scientific/medical concepts."  (*Id.*)  The Scheduling Order listed examples of possible key facts that were agreed upon, including the type of vaccine petitioner received, the ultimate diagnosis of seronegative rheumatoid arthritis, and the onset of symptoms.  (*Id.*)  The Scheduling Order provided that the parties "should come to some agreement about the level of T cell specificity to individual proteins," and that "the parties should endeavor to reach some agreement about what is currently known about T cell specificity and promiscuity."  (*Id.*)

After considerable delay, the parties filed two separate documents in March of 2021.  (ECF No. 187.)  Petitioner filed Exhibit 66, titled "Proposed Areas of Agreement," and respondent filed a chart titled "Respondent's Chart of Contentions."  (*Id.*)  The filings were reviewed during a status conference on March 23, 2021, and it was noted that the parties wanted to file additional documents in support of their positions, followed by post-hearing briefs.  (ECF No. 189.)  On May 17, 2021, respondent filed supplemental rebuttal reports by Drs. Matloubian and Whitton (ECF No. 194; Exs. H-I), and petitioner filed her rebuttal report by Dr. Utz on July 9, 2021 (ECF No. 200; Ex. 69).  Petitioner filed her post-hearing brief on March 9, 2022, and respondent filed his responsive post-hearing brief on July 22, 2022.  (ECF Nos. 209, 212.)  Petitioner filed her reply brief on January 17, 2023.  (ECF No. 219.)

As noted above, this case was then reassigned to my docket.  In light of the procedural history of this matter outlined above, I have determined that the parties have had a full and fair opportunity to develop the record.[8]  *See* Vaccine Rule 8(d); Vaccine

---

[7] During the entitlement hearing, Dr. Utz referred to Exhibit 64 as the "Raychaudhuri article," but the lead author of this article is Buhm Han.  (Buhm Han et al., *Fine Mapping Seronegative and Seropositive Rheumatoid Arthritis to Shared and Distinct HLA Alleles by Adjusting for the Effects of Heterogeneity*, 94 Am. J. Hum. Genetics 522 (2014) (Ex. 64).)  Petitioner also filed the same article on March 23, 2021, as Exhibit 68, an exhibit designation duplicated in connection with petitioner's second motion for interim attorneys' fees.  (ECF No. 188.)  For purposes of this decision, I shall reference this article as Exhibit 64 and the "Han et al." article.

[8] I stress, in particular, that I have carefully considered whether it would be necessary to reopen the record so that I could hear live testimony from the witnesses, and I have concluded, based on my review of the current record, as well as in light of the analysis that follows, that it is not necessary.  The Court of Federal Claims has previously confirmed that reassignment of a case to a new special master after the case has become ripe for resolution does not in itself raise any due process issue.  *Kelly v. Sec'y of Health & Human Servs.*, 160 Fed. Cl. 316, 322-23 (2022).  Moreover, under the Vaccine Act, hearings are permissive, rather than mandatory.  *Prepejchal v. Sec'y of Health & Human Servs.*, 141 Fed. Cl. 519, 527 (2019).  A newly assigned special master may act within his discretion to determine for himself whether the claim can be fairly resolved without any hearing.  *Kelly*, 160 Fed. Cl. at 322-23.   In making that determination, the key consideration is "whether petitioner has had a fair chance to present his case."

Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, this matter is now ripe for resolution.

### III.    Factual History

### a.  As reflected in the medical records

Prior to receiving the subject vaccination on September 19, 2011, petitioner had a history of low back pain, chronic sinusitis, and degenerative joint disease in her right knee.  (Ex. 2, pp. 2, 48-49, 52-53.)  Approximately one year prior to the vaccination at issue, on September 20, 2010, petitioner sought treatment with her primary care physician, Luis Henkel, M.D., for pain in her arms, legs, and neck, that had begun one month prior to the appointment.  (*Id.* at 54.)  She was diagnosed with polyarthralgia, and rheumatology labs were ordered.  (*Id.* at 55.)  The record does not contain results of these tests.  On September 19, 2011, petitioner had an appointment with Dr. Henkel for an unrelated issue and she was prescribed a topical antibiotic.  (*Id.* at 60-62.)  Petitioner was also administered the flu vaccine at this appointment.  (*Id.* at 61)

Seven days later, on September 27, 2011, petitioner returned to Dr. Henkel complaining of joint pains.  (Ex. 2, p. 68.)  The record states, "after she got the flu shot, on 09/19/11, she developed joint pains in joints entire body, stiffness, all the time.  She never had this before.  Hands, wrists, elbows, shoulder.  She feels swollen." (*Id.*) Petitioner reported having pain in her right arm, but the vaccination was in her left arm, and she was taking ibuprofen to alleviate the pain.  (*Id.* at 68-69.)  The physical exam by Dr. Henkel noted that petitioner had difficulty elevating both of her arms above her head due to pain and she was tender to pressure/palpation of her proximal interphalangeal

---

*D'Tiole v. Sec'y of Health & Human Servs.*, 132 Fed Cl. 421, 434 (2017).  Generally, hearings are considered helpful where live testimony is necessary to assess witness credibility or whether additional information is needed that is not self-evident on the existing record.  *Id*. at 433-34.  However, a special master does not necessarily need to hold a hearing in order assess the relative credibility of the parties' experts.  *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) ("We also reject the argument that the special master violated the Kreizenbecks' due process rights by evaluating the credibility of their experts and Mrs. Kreizenbeck without live testimony or cross-examination."); *see also Burns v Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993); *Prepejchal*, 141 Fed. Cl. at 527-28 (finding no error where the special master concluded petitioner's expert's theory "did not require further explanation, that he did not require live testimony to weigh credibility, and that petitioner's medical record spoke for itself").  *But see Kottenstette v. Sec'y of Health & Human Servs.*, 861 F. App'x 433, 442 (Fed. Cir. 2021) (finding error where a subsequently reassigned special master reweighed previously elicited witness testimony on remand after the first special master had already made credibility determinations).  In this case, my analysis does not turn on the details of the fact witness testimony.  Moreover, my review of the expert submissions and previously provided expert testimony confirms that the experts' views have been fully explored.  And, notably, although this case has had a long procedural history, the previously presiding special master had not made any findings or credibility determinations prior to the reassignment.

joints ("PIP"), distal interphalangeal joint ("DIP"), metatarsophalangeal joints ("MTP")[9], wrist and elbow joints.  (*Id.* at 69.)  Dr. Henkel diagnosed petitioner with polyarthralgia and wrote:

> Comment: unclear if symptoms are correlated with vaccination or not, possibly concomitant process.  Pt is having arthralgias with synovitis symptoms.  In addition, focal complaint related to right trapezius . . . tension/spasm.

(*Id.*)  Petitioner was given a seven-day prescription of naproxen and a prescription of Tramadol to be taken as needed.  (*Id.*)  Later that same day, on September 27, 2011 at 12:43 p.m., Dr. Henkel wrote an addendum to the record from petitioner's appointment, acknowledging that petitioner had "similar complaints in the past with polyarthralgia and on 9/20/10 w/u was requested, those labs were not obtained at that time.  *This goes against process precipitated by recent vaccination*."  (*Id.* (emphasis added).)

Petitioner had an appointment with Catherine Silva, M.D., on October 17, 2011, for a follow-up for joint and muscle pains.  (Ex. 2, p. 72.)  Petitioner reported that she received the flu vaccine on September 19, 2011, and the next day, she had sore, painful, and swollen joints, diffusely, with the right side being greater than the left.  (*Id.*)  These symptoms were in petitioner's hands, fingers, wrists, shoulders, and knees, but not in her hips or feet.  (*Id.*)  The Tramadol and naproxen provided little pain relief.  (*Id.*)  Petitioner had traveled to Costa Rica and, while there, she received an "anti-inflammatory" shot, which provided relief for two days.  (*Id.*)  Dr. Silva diagnosed petitioner with arthralgia and myalgia and described "[a]cute onset polyarthritis with component of muscle pain also, mainly upper arms.  Labs unremarkable 3 weeks ago. . . . Consider other viral illness, early or seroneg[ative] RA, vaccine reaction unlikely." (*Id.* at 73.)  Petitioner was referred to a rheumatologist and given a short course of prednisone.  (*Id.*)  Three days later, on October 20, 2011, Dr. Silva submitted a Vaccine Adverse Event Reporting System ("VAERS") report on behalf of petitioner.  (*Id.* at 64-68.)  In the VAERS report, Dr. Silva hand wrote that petitioner received the flu vaccine on September 19, 2011, and on September 20, 2011, she "developed diffuse polyarthritis with pain, swelling, [illegible – MTPs or MCPs], PIPs, [illegible – possibly wrists], knees, feet."  (*Id.* at 64.)

Petitioner saw Dr. Henkel on December 9, 2011, for a follow-up for her polyarthralgia.  (Ex. 2, pp. 76-79.)  Petitioner was complaining of pain in her wrists and hands, bilaterally, along with her ankles and Achilles tendons.  (*Id.* at 76-77.)  Petitioner reported that she had improved a lot since October 17, 2011, with the prescription for prednisone.  (*Id.* at 77.)  At this appointment, petitioner reported the onset of her symptoms began two days after the vaccination.  (*Id.*)  Dr. Henkel reviewed petitioner's labs, noting that there was no evidence of a rheumatologic process.  (*Id.*)  After

---

[9] Dr. Utz felt the reference to MTP is likely a typographic error because there is no indication that petitioner's feet were examined, suggesting it should reference "MCP" (metacarpophalangeal joint) instead.  (Tr. 81.)

confirming petitioner's improvement with prednisone, Dr. Henkel prescribed another prednisone taper. (*Id.*)

Petitioner had an initial appointment with rheumatologist Nathalie Boileau, M.D., on January 30, 2012. (Ex. 3, pp. 1-2.) Petitioner reported receiving the flu shot and then, one day later, developing generalized arthralgias, chills, headaches, and dyspnea. (*Id.* at 1.) Petitioner reported swelling in multiple joints, including her hands, wrists, shoulders, knees, and feet. (*Id.*) The naproxen and tramadol provided no relief, but the oral prednisone provided significant improvement in petitioner's swelling and some improvement in her generalized pain. (*Id.*) Petitioner reported having fluctuating and migratory pain in her joints and "bones" with associated intermittent swelling. (*Id.*) Further, petitioner reported sleep disruptions and an exacerbation of her chronic low back pain and right knee pain, which were believed to be related to her degenerative arthritis. (*Id.*) Petitioner also reported transient, intermittent paresthesias in her hands and feet, and morning stiffness, as well as occasional headaches. (*Id.*) Dr. Boileau wrote that she did not see any evidence of active joint inflammation at the time of examination, but that petitioner "may have had an acute inflammatory arthritis in October," or "Perhaps, she had a serum sickness type reaction to the vaccine." (*Id.* at 2.) Dr. Boileau also stated that that "persistent widespread migratory nature of her pain in the setting of sleep disturbance and mood disorder is suggestive of the fibromyalgia syndrome," but hesitated to make a diagnosis before reviewing petitioner's most recent lab work. (*Id.*)

Petitioner had an appointment the following day, January 31, 2012, with Dr. Henkel for a follow-up of her arthralgias and depression. (Ex. 2, p. 82.) Dr. Henkel performed a hand exam and documented no enlargement and no tenderness. (*Id.*) He gave her a referral for physical therapy and recommended she begin an antibiotic for sinusitis. (*Id.*)

On April 17, 2012, petitioner had an appointment with Idriss El Koussaimi, M.D., for polyarthralgia in her hands, elbows, shoulders, and legs. (Ex. 2, pp. 85-87.) Petitioner reported that her symptoms began after she received the flu vaccine last year that "left her incapable of moving." (*Id.* at 85.) Petitioner reported persistent weakness and polyarthralgia, as well as intermittent swelling and redness in her joints. (*Id.*) Petitioner exhibited hand joint tenderness and upper extremity weakness during the physical exam. (*Id.* at 86-87.) Dr. El Koussaimi diagnosed petitioner with polyarthralgia with an "unclear etiology" and prescribed oral steroids. (*Id.* at 87.)

At petitioner's May 2, 2012 follow-up appointment with Dr. El Koussaimi, she reported that she only just began the prednisone course he had prescribed at the April 17th appointment. (Ex. 2, p. 88.) Although petitioner stated that the steroids may have decreased her hand pain, she reported that it "makes her arms and legs feel heavy." (*Id.*) Dr. El Koussaimi documented tenderness on the physical exam, though it was not noted where petitioner was experiencing this tenderness and Dr. El Koussaimi observed no evidence of arthritis. (*Id.* at 89.) Petitioner was diagnosed with polyarthralgia and neck pain, and given a referral to a rheumatologist. (*Id.*)

8

Petitioner had an appointment with rheumatologist Peter Grayson, M.D., on May 31, 2012.  (Ex. 58, pp. 2-5.)  Petitioner reported that that she developed pain in multiple joints the day after she received the flu vaccine, as well as swollen lymph nodes in her neck.  (*Id.* at 2.)  Petitioner reported that her joint pain is constant, and she has intermittent swelling and warmth in her joints.  (*Id.*)  Her pain was localized to the wrist, shoulder, neck, knee, ankles, DIP and PIP joints, Achilles tendon area, and low back.  (*Id.*)  The physical exam was positive for tenderness to the MTP joint and metacarpophalangeal ("MCP") joint, and she exhibited pain with internal rotation of her shoulders.  (*Id.* at 3.)  Dr. Grayson did not appreciate any synovitis during her exam and opined that it was likely because petitioner was taking nonsteroidal medication.  (*Id.*)  Petitioner was diagnosed with "polyarthralgias with a clinical history strongly suggestive of inflammatory arthritis," with a differential diagnosis of seronegative rheumatoid arthritis versus spondyloarthropathy.  (*Id.*)  Dr. Grayson favored a diagnosis of seronegative rheumatoid arthritis.  (*Id.*)  Petitioner was given a prescription of hydroxychloroquine and an oral steroid.  (*Id.*)  Petitioner also discussed with Dr. Grayson whether the flu vaccine caused her condition and he wrote, "The temporal relationship is suggestive, however, there [is] not enough clinical evidence to link the vaccination with the development of rheumatoid arthritis."  (*Id.*)  He agreed with petitioner's decision to not receive future flu vaccines.  (*Id.*)

On May 6, 2013, petitioner had an appointment with Dr. El Koussaimi for bilateral sciatica, which was making it difficult for her to walk.  (Ex. 2, p. 114.)  Petitioner reported associated tingling.  She had positive straight leg raises bilaterally.  (*Id.* at 115.)  The diagnosis was sciatica, and she was awaiting a referral to a pain medication specialist.  (*Id.* at 116.)

On June 26, 2013, petitioner had a follow-up rheumatology appointment with Paul Monach, M.D.  (Ex. 58, pp. 23-24.)  Petitioner reported that the hydroxychloroquine had improved her joint pain, but she was experiencing increased muscle pain, as well as gastrointestinal issues.  (*Id.* at 23.)  Her muscle pain improved after discontinuing hydroxychloroquine, but her joint pain was now worse.  (*Id.*)  Petitioner had pain upon joint compression and her passive range of motion in her small joints in her hands and wrists "are in a distribution suggesting inflammatory arthritis."  (*Id.*)  Dr. Monach diagnosed petitioner with "likely inflammatory arthritis with probable response to hydroxychloroquine, but very likely muscle toxicity."  (*Id.*)  Dr. Monarch refilled petitioner's prednisone prescription and started her on a trial of sulfasalazine.  (*Id.* at 24.)  He also considered starting petitioner on omeprazole if she required a nonsteroidal pain treatment.  (*Id.*)

Thereafter, petitioner moved to Florida where she had several medical appointments related to her joint pain.  At her initial appointment at Miami Beach Medical Group on April 15, 2015, to establish care, petitioner reported having severe rhinitis, as well as pain and swelling in her elbow.  (Ex. 16, pp. 2-4.)  Petitioner was referred to a rheumatologist, and labs were ordered for rheumatoid arthritis.  (*Id.* at 4.)

On February 16, 2016, petitioner had a new patient rheumatology appointment with Magdalena Perez-Rivera, M.D. (Ex. 17, pp. 25-26.) Petitioner reported generalized pain, decreased hand grip, and swelling in her wrists, fingers, and ankles. (*Id.* at 25.) She reported that naproxen relieved her pain. (*Id.*) Petitioner was diagnosed with inflammatory polyarthropathy and labs were once again ordered. (*Id.*) Petitioner had a follow-up appointment with Dr. Perez-Rivera on April 5, 2016, to discuss her labs. (*Id.* at 18-20.) Petitioner had a positive Sjögren's antibody and elevated c-reactive protein. (*Id.* at 18.) Dr. Perez-Rivera diagnosed polyarthralgia and carpal tunnel syndrome and recommended that petitioner begin a prednisone trial. (*Id.* at 20.) At petitioner's follow-up rheumatology appointment on December 16, 2016, petitioner reported having neck and cervical pain, which was aggravated with range of motion. (Ex. 19, pp. 1-3.) She continued to report intermittent swelling in the joints of her hands, wrists, fingers, and ankles, as well as decreased hand grip. (*Id.* at 1.) On physical exam, petitioner exhibited tenderness on her right elbow and ankle. (*Id.* at 2.)

When petitioner returned to Boston, Massachusetts, in early 2017, her first appointment was with Jai Marathe, M.D., on February 1, 2017. (Ex. 56, pp. 19-23.) Petitioner reported having multiple joint pains, but the small joints of her fingers, right shoulder, and right ankle were particularly painful. (*Id.* at 20.) Petitioner sought a referral to a rheumatologist and a new prescription for prednisone. (*Id.*) Petitioner endorsed pain in the small joints of her fingers during the physical exam, but no swelling or joint effusion was observed. (*Id.*) Petitioner was diagnosed with seronegative rheumatoid arthritis and started on a low dose prednisone until she could see a rheumatologist. (*Id.* at 20-21.)

On March 13, 2017, petitioner returned to Dr. Monach. (Ex. 58, pp. 31-35.) Petitioner's history was notable for seronegative non-erosive inflammatory polyarthritis. (*Id.* at 31.) Dr. Monach noted that petitioner had previously used hydroxychloroquine but discontinued the medication due to gastrointestinal issues. (*Id.*) Petitioner reported using prednisone for the past three years. (*Id.*) She reported persistent joint swelling and pain in her hands, elbows, shoulder, and feet, along with morning stiffness. (*Id.*) Dr. Monach observed joint swelling in petitioner's 2nd and 3rd MCP joints in both hands, tenderness in all MCP and PIP joints, wrist tenderness bilaterally, bursitis in the left elbow, and tenderness over the right acromioclavicular joint with positive cross arm sign. (*Id.* at 33.) Dr. Monach diagnosed petitioner with seronegative inflammatory polyarthritis, as confirmed by synovitis on exam. (*Id.* at 34.) Petitioner was prescribed 10 mg of methotrexate[10] in addition to her prednisone. (*Id.*)

Petitioner had a follow-up rheumatology appointment on July 19, 2017, and endorsed continued symptoms related to her polyarthritis. (Ex. 58, pp. 51-55.) Petitioner reported that she had discontinued methotrexate because she "noticed that her throat was closing in and experienced [a] sore throat type of sensation." (*Id.* at 52.)

---

[10] Methotrexate is used in the treatment of, *inter alia*, severe rheumatoid arthritis. *Methotrexate*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=30930 (last visited May 8, 2026).

Petitioner was having neck pain, bilateral elbow and knee pain, ankle swelling, and hand swelling resulting in difficulty grabbing objects. (*Id.*) She also reported numbness in bilateral feet that was likely due to her being pre-diabetic. (*Id.*) Petitioner's physical exam was largely unchanged since her March 13, 2017 appointment with the exception of swelling in her bilateral elbows. (*Id.* at 52-53.) Dr. Monach noted that petitioner's exam was consistent with active seronegative inflammatory polyarthritis and prescribed leflunomide. (*Id.* at 54.)

Approximately one year later, on July 24, 2018, petitioner had an appointment with Raphael Kieval, M.D., Assistant Clinical Professor of Medicine in the Rheumatology Section at Boston Medical Center. (Ex. 58, pp. 79-81.) Petitioner reported that she had started the leflunomide but stopped because of rectal bleeding. (*Id.* at 80.) Dr. Kieval observed that petitioner did not have "much in the way of synovitis," but she did have some joint swelling last year. (*Id.*) Petitioner's physical examination was negative for swollen joints, although she had "some squeeze tenderness over the MCP joints, but not the PIP joints or the DIP joints." (*Id.* at 81). Dr. Kieval's diagnosis was seronegative rheumatoid arthritis, but petitioner was not doing well due to medication intolerance. (*Id.*) He recommended Celebrex for treatment. (*Id.*).

On November 13, 2018, petitioner had a follow-up appointment with Dr. Kieval, during which she reported swelling of her right knee and pain in other joints. (Ex. 58, p. 92.) Petitioner had never begun the Celebrex medication. (*Id.*) On exam, petitioner's right knee was slightly swollen and she had "some squeeze tenderness over the MCP joints." (*Id.*) Dr. Kieval again recommended petitioner begin Celebrex and also prescribed Plaquenil to be taken as needed. (*Id.*)

On May 16, 2019, petitioner went to Lahey Health Urgent Care for arm, shoulder, and wrist pain. (Ex. 62, pp. 1-3.) Petitioner explained that she had recently moved to the area and was experiencing joint swelling in her shoulder, elbows, wrists, and hands. (*Id.* at 1.) Petitioner's prescription for Plaquenil had not been refilled and she was experiencing severe pain. (*Id.*) After a physical exam, during which petitioner endorsed pain with range of motion and pain in her right elbow, she was given a prescription for naproxen and a dose of Toradol. (*Id.* at 2.) It was recommended that petitioner follow-up with a rheumatologist as soon as possible. (*Id.*)

No additional medical records have been filed.

### b. Hearing Testimony

Petitioner, Ms. Jean Landry (petitioner's daughter), and Mr. Estaban John Monge (petitioner's son), testified at the entitlement hearing held on February 11, 2019 in Boston, Massachusetts.

### 1.  Testimony of Petitioner

Petitioner testified that prior to receiving the flu vaccine on September 19, 2011, she was feeling fine.  (Tr. 29.)  Petitioner stated that, after she received the vaccine, she felt that her throat was swollen and she could not swallow or breathe, and she thereafter started to have pains and she described feeling rigid and paralyzed.  (*Id.* at 29-30.)  She testified that it was "maybe eight days," after the vaccine (*Id.* at 30-31), but it is unclear if petitioner was explaining the onset of her condition or when she went to Costa Rica to visit her mother.

Petitioner testified that prior to her September 19, 2011 vaccination, she had been getting treatment for herniated discs in her spine, which could cause pain that radiated down her legs.  (Tr. 33-34.)  Petitioner explained that she had received an injection for lumbar back pain.  (*Id.* at 42.)  She stated that she had never experienced pain in her hands and fingers prior to the September 2011 flu vaccination, only lumbar back pain.  (*Id.* at 33-34.)  When respondent asked petitioner about her prior medical history, petitioner testified that her back pain radiated down from her waist to her knees.  (*Id.* at 48.)  However, she testified that after vaccination she could not move her arms and her pain was "everywhere" and "incredibly strong."  (*Id.* at 35.)  Petitioner also experienced swelling in her hands and fingers, and that her "wrists felt like they were broken."  (*Id.*)

Petitioner testified that her first appointment with Dr. Henkel after the flu vaccine at issue was on September 27, 2011, and that she felt joint pain throughout her entire body.  (Tr. 50-52.)  Consistent with her medical records, petitioner also testified that she had an appointment with Dr. Silva on October 17, 2011, and she was tested for Lyme and Lupus.  (*Id.* at 56.)  Petitioner testified that she was unaware that Dr. Silva completed the VAERS report on her behalf.  (*Id.* at 57.)

### 2.  Testimony of Ms. Jean Marie Landry

Petitioner's daughter, Ms. Jean Marie Landry, testified on behalf of petitioner.  (Tr. 9-18.)  Ms. Landry testified that, prior to the September 19, 2011 vaccination, she believed petitioner to be healthy, but afterwards, petitioner appeared to be in pain and her health seemed to be declining.  (*Id.* at 9-10.)  Ms. Landry testified that she also observed swelling in petitioner's hands and noted that petitioner complained about being in a lot of pain.  (*Id.* at 10.)

Prior to the September 19, 2011 flu vaccine, petitioner would care for Ms. Landry's children five days a week.  (Tr. 10.)  Ms. Landry explained that the petitioner was the primary caretaker for her youngest child while she was at work during the period of September 2010 through September 2011.  (*Id.* at 11-12, 17.)  Ms. Landry stated that she recalls after the September 19, 2011 flu vaccine, petitioner told her she was not feeling well.  (*Id.* at 12.)  Ms. Landry testified that she noticed petitioner's hands were swollen and that petitioner was unable to hold things.  (*Id.*)  She described petitioner's hands as looking "stiff" and that she was unable to close them.  (*Id.* at 15.)

12

She also described how petitioner's joints looked "swollen," and it appeared that petitioner was having issues with the blood circulation in her hands. (*Id.*) Ms. Landry explained that a few days after the vaccination, petitioner told her that she would be unable to take care of her son, resulting in Ms. Landry needing to seek alternative childcare. (*Id.* at 16-17.) When asked if she had observed petitioner experiencing any back or knee pain while caring for her son, Ms. Landry testified that petitioner would complain of a backache when doing a lot of cleaning, but it did not interfere with her ability to care for her son. (*Id.* at 17.)

Ms. Landry testified that petitioner went to Costa Rica for a few weeks because petitioner's mother was sick (Tr. 13), and when petitioner returned, she was "crying a lot, and she was telling [Ms. Landry] that all her joints and all her body was hurting" (*Id.* at 14). Further, Ms. Landry testified that when petitioner returned from Costa Rica in October, it looked as if petitioner's hand swelling had continued. (*Id.* at 16.)

### 3. Testimony of Mr. Estaban John Monge

Petitioner's son, Mr. Estaban John Monge, also testified at the entitlement hearing. (Tr. 19-26.) At the time of the flu vaccination in September 2011, Mr. Monge was living with the petitioner. (*Id.* at 20.) Mr. Monge testified that prior to the September 2011 flu vaccine, petitioner mentioned back pain, but she was outgoing, energetic, and very productive. (*Id.* at 20, 22.) He stated that, after the vaccination, she was fatigued, weak, and always complaining about swelling and not being able to breathe. (*Id.* at 21.)

Mr. Monge testified that he had observed swelling in petitioner's hands after the vaccination. (Tr. 22.) Specifically, he testified that he observed swelling from the point where petitioner's wrist meets the bottom of her hands to her knuckles. (*Id.* at 26.) Mr. Monge explained that petitioner would be prepping a meal, but would be unable to continue due to pain from the swelling in her hands and Mr. Monge would have to take over. (*Id.* at 22.) He observed that, at times, she would drop kitchen items, such as plates or utensils. (*Id.* at 22-23.)

13

IV.    **Expert Opinions**

      a.    **Petitioner's Rheumatology and Immunology Expert, Paul Utz, M.D.[11]**

Dr. Utz authored four expert reports and testified at the entitlement hearing on behalf of petitioner.  (Exs. 9, 20, 27, 69; Tr. 69-479, 882-1022.)  Dr. Utz opined that the flu vaccine that petitioner received on September 19, 2011 caused her to develop seronegative RA, which led to petitioner secondarily developing Sjögren's syndrome.  (Ex. 9, p.3; Ex. 20, pp. 1-2; Tr. 188.)  During the hearing, however, petitioner's counsel confirmed that petitioner was withdrawing any claim that she suffered Sjogren's disease secondary to her rheumatoid arthritis. (Tr. 502.)

Dr. Utz notes that petitioner's medical history prior to the flu vaccination at issue included degenerative joint disease, low back pain, spondylosis, sinusitis, fibromyalgia, and most relevant, polyarthralgia.  (Ex. 9, p. 2.)  Dr. Utz acknowledged that petitioner presented to her primary care provider on September 20, 2010 for pain in her arms and neck, but testified that this record does not indicate that petitioner was experiencing joint pain in those areas.  (*Id.* at 3; Tr. 175-77, 441.)  Dr. Utz stated that petitioner's primary care physician should not have been ordering test for rheumatoid arthritis, as petitioner's charts had "no history at this point of symmetric polyarthralgia, symmetric polyarthritis, [or] morning stiffness."  (Tr. 178.)  Dr. Utz stated that petitioner's medical records did not include any description of joint discomfort consistent with RA prior to her receipt of her flu vaccine on September 19, 2011, and also opined that no other identifiable trigger is available to explain her subsequent development of seronegative RA.  Therefore, he opines the vaccine was the trigger, and a substantial contributing factor, that led directly to her RA.  (Ex. 9, pp. 3-4; Tr. 188.)

Dr. Utz, describing petitioner's medical history after the flu vaccine on September 19, 2011, stated that, at her first appointment with Dr. Henkel on September 27, 2011, petitioner was positive for "symmetric tenderness with pressure/palpitation of her PIP, DIP, MTP, wrist and elbow joints."  (Ex. 9, p. 3 (quoting Ex. 2, p. 69).)  He acknowledged that Dr. Henkel added an addendum to petitioner's medical record that made note of petitioner's prior history of complaints of polyarthralgia and Dr. Henkel's opinion that her prior history "goes against process precipitated by recent vaccination."  (*Id.*)  Referring to the VAERS report, Dr. Utz states, "Petitioner was noted to have an acute response to the vaccine.  'Next day developed diffuse polyarthritis with pain,

---

[11] Dr. Utz received his medical degree from Stanford University School of Medicine in 1991, before going on to complete an internship and residency at Brigham and Women's Hospital in 1992 and 1993, respectively, followed by a clinical fellowship in immunology and rheumatology at Brigham and Women's Hospital, as well as a research fellowship at Dana Farber Cancer Institute, in 1996.  (Ex. 53, p. 1.) Although Dr. Utz maintains an active medical license, he transitioned to focusing primarily on teaching and research.  (Tr. 64-67.)  Dr. Utz emphasizes his expertise in caring for patients with autoimmune conditions, especially RA, as well as his research, which focuses on "trying to understand why patients develop autoimmune diseases, why they make autoantibodies, why they develop autoreactive T cells and so forth."  (*Id.* at 66.)  Dr. Utz was accepted as an expert in immunology and rheumatology.  (*Id.* at 72-73.)

14

swelling MTPs <metacarpophalangeal joints>, PIPs <proximal interphalangeal joints>, wrists, knees, and feet.'" (*Id.*; Ex. 2, p. 65; *see also* n. 9, *supra*.)

Dr. Utz explains that petitioner's clinical history and treatment history are supportive of the diagnosis of seronegative rheumatoid arthritis. (Ex. 9, pp. 2-3; Ex. 20, p. 2.) Petitioner endorsed morning stiffness, she had an elevated CRP, she demonstrated arthritis of her hand joints on physical examinations, and her arthritis was symmetric. (Ex. 9, p. 3, Tr. 77-83, 86-93, 96-101; *see also* Ex. 3, pp. 1-2.) Dr. Utz acknowledges that petitioner may not have demonstrated synovitis in her joints, but he opines that petitioner's active use of steroids, non-steroidal anti-inflammatory medication, and/or Plaquenil suppressed synovitis. (Ex. 9, pp. 3, 5; Ex. 20, p. 2.)

Dr. Utz explains that RA can have an acute or subacute onset and can be triggered by viruses or by other inflammatory triggers. (Ex. 9, p. 8.) Risk factors that may increase the risk of RA, include age, sex, gingivitis, use of tobacco, and family history. (Tr. 189; Ex. 20, p. 6.) Dr. Utz testified that petitioner's only risk factors were her age and sex. (Tr. 189.) In his second report, Dr. Utz acknowledges that certain genetic studies have identified specific alleles of DR1 and DR4 to be associated with rheumatoid arthritis. (Ex. 20, pp. 8-9 (citing Ex. A, p. 12).) Genetic predisposition to RA has been strongly associated with the major histocompatibility complex (MHC) class II HLA-DRB1 locus, with approximately 80% of Caucasian patients with RA expressing DR4 or DR1 allotypes. (Andréa Dessen et al., *X-ray Crystal Structure of HLA-DR4 (DRA*0101, DRB1*0401) Complexed with a Peptide from Human Collagen II*, 7 IMMUNITY 473 (1997) (Ex. 23).)

Dr. Utz opines that the mechanism of molecular mimicry between the flu vaccine and certain self-antigens caused petitioner to develop RA. (Ex. 9, pp. 6-7; Ex. 20, p. 10.) He describes it as "an immune response to a nonself antigen such as components of an influenza vaccine, cross reacts with self molecules," and that immunologic tolerance is broken, "the self antigens replace the initial inciting agent (e.g., an infectious agent that is cleared, or a vaccine that is also eventually degraded), and the disease is perpetuated for months, years, or sometimes for life." (Ex. 9, pp. 6-7.) Dr. Utz contends that molecular mimicry is well established as the mechanism for causing other autoimmune conditions, such as rheumatic fever, where antigens from beta streptococcus cross-react with antigens in the joints, brain, skin, and heart, causing acute rheumatic fever. (*Id.*) With respect to molecular mimicry between the flu vaccine and RA, Dr. Utz opines that the influenza hemagglutinin (HA) peptide found in flu vaccines and the Type II collagen peptide, a constituent of joint synovium, are sufficiently similar to cause a T-cell cross-reaction and induce RA in mice. (Ex. 9, pp. 7, 11; Tr. 190-91.) However, Dr. Utz emphasizes that an adjuvant is also required. (Tr. 201.) He explains that the "Injection of Type II collagen *in combination with adjuvant* into mice leads to the development of B and T cell autoreactivity, associated with severe synovial inflammation (as was observed in Ms Monge-Landry after her vaccination)." (Ex. 9, p. 10.) Dr. Utz explains that "the adjuvant is required. If you do collagen alone, it typically doesn't [cause a reaction]. So part of what's thought to happen is that the adjuvant causes local inflammation." (Tr. 201-02.)

Dr. Utz explains that rheumatoid arthritis is a T-cell mediated autoimmune disease (Tr. 200, 204-05; *see also* Xia Li et al., *Influenza Virus Haemagglutinin-Derived Peptides Inhibit T-Cell Activation Induced by HLA-DR4/1 Specific Peptides in Rheumatoid Arthritis*, 24 CLINICAL & EXPERIMENTAL RHEUMATOLOGY 148 (2006) (Ex. 25)) and autoreactive T-cells to Type II collagen are implicated in its pathogenesis (Ex. 9, p. 11; Tr. 193-94; Ex. 20, p. 17 (citing Taichi Sekine et al., *Type II Collagen is a Target Antigen of Clonally Expanded T cells in the Synovium of Patients with Rheumatoid Arthritis*, 58 ANNALS RHEUMATIC DISEASES 446 (1999) (Ex. 26)); *see also* Wolfgang Hueber et al., *Antigen Microarray Profiling of Autoantibodies in Rheumatoid Arthritis*, 52 ARTHRITIS & RHEUMATISM 2645 (2005) (Ex. 46)).)  However, "[t]he antigen(s) responsible for the induction of the autoimmunity in RA are unknown.  Type II collagen . . . is a candidate antigen since it is the predominant protein of joint cartilage and since auto-antibodies against [Type II collagen] are found in elevated levels in the serum and joints of patients with RA."  (Dessen et al., *supra*, at Ex. 23, p. 1; *see also* Ex. 20, pp. 9-10.) Additionally, other articles explain that a subset of RA patients also have autoantibodies against cyclic citrullinated peptides (anti-CCP), which are associated with erosive disease.  (*See, e.g.*, Karin Lundberg et al., *Periodontitis in RA—the Citrullinated Enolase Connection*, 6 NATURE REVS. RHEUMATOLOGY 727 (2010) (Ex. 22)).)  During the hearing, Dr. Utz testified that because petitioner was CCP negative and had a "low CRP," it was more likely than not that she had antibodies against Type II collagen.  (Tr. 199.)

Dr. Utz asserts that because both the influenza hemagglutinin peptide and the Type II collagen peptide can bind to the MHC HLA-DR4/1 molecules and activate T-cells, T-cells activated by the hemagglutinin peptide can react to collagen peptides found in the joints, resulting in inflammation.  (Ex. 9, p. 11; Ex. 20, pp. 8-9; Tr. 248-50, 270-71.)  Dr. Utz states that the Hennecke & Wiley article demonstrates that the "T-cell receptor (TCR) HA1.7 specific for hemagglutinin (HA) antigen peptide from influenza A virus is HLA-DR1 restricted but cross-reactive for the [hemagglutinin] peptide presented by the allo-major histocompatibility complex (MHC) class II molecule HLA-DR4," and because the T-cell to the hemagglutinin molecule can also bind to HLA-DR4 found on Type II collagen, it is cross-reactive.  (Ex. 20, p. 10; Tr. 253-55 (citing Jens Hennecke & Don C. Wiley, *Structure of a Complex of the Human α/β T Cell Receptor (TCR) HA1.7, Influenza Hemagglutinin Peptide, and Major Histocompatibility Complex Class II Molecule, HLA-DR4 (DRA\*101 and DRB1\*0401): Insight into TCR Cross-Restriction and Alloreactivity*, 195 J. EXPERIMENTAL MED. 571 (2002) (Ex. 24)).)  Dr. Utz states that the crystal structure demonstrated in Hennecke & Wiley "shows unequivocally that an influenza peptide binds to the DR4 MHC molecule, and looks almost indistinguishable from a peptide derived from a documented RA self antigen (collagen), in the pocket of the molecule."  (Ex. 20, p. 11 (discussing Hennecke & Wiley, *supra*, at Ex. 24, p. 6, fig. 4).)  During the hearing, Dr. Utz acknowledged that the paper by Hennecke & Wiley does not show a T-cell cross-reaction between influenza hemagglutinin peptide and Type II collagen peptide, only that the same MHC HLA-DR4/1 molecules can recognize the two different peptides.  (Tr. 372-73.)

Dr. Utz attempts to demonstrate a cross-reaction by T-cells activated by the influenza hemagglutinin to RA peptides through articles by Sun et al. and Li et al., respectively. (Ex. 20, p. 12; Tr. 256-65.) Dr. Utz initially wrote, "Sun and colleagues . . . have demonstrated that hemagglutinin peptides can activate T cells that can cause synovitis." (Ex. 9, p. 10 (citing Jian Sun et al., *Superior Molecularly Altered Influenza Virus Hemagglutinin Peptide 308-317 Inhibits Collagen-Induced Arthritis by Inducing CD4+ Treg Cell Expansion*, 64 ARTHRITIS & RHEUMATISM 2158 (2012) (Ex. 14)).) However, after both Drs. Matloubian and Whitton observed that Dr. Utz mischaracterized the findings of Sun et al., Dr. Utz testified that his report should have stated, "Sun and colleagues have demonstrated that *altered* hemagglutinin in peptides can *suppress* T cells that can cause synovitis." (Tr. 266 (emphasis added).) During the hearing, Dr. Utz also clarified that he meant to cite a different part of the Sun paper, which states, "HA308-317 peptide is a high-affinity HLA-DRA4/1 binding peptide. Skinner et al have described that [hemagglutinin] peptide induced T cell activation in an HLA-DR4/1-restricted manner and thus might mediate the inflammatory process in RA." (Sun et al., *supra*, at Ex. 14, p. 9); *see also* Tr. 270.) With respect to the Li article, Dr. Utz opines that it demonstrates that T-cells can be stimulated in response to hemagglutinin and collagen, which can lead to cross-reactivity. (Ex. 20, p. 13; Ex. 27, pp. 6-7 (citing Li et al., *supra*, at Ex. 25).) Li et al. took serum from DR4/1 positive RA patients, then stimulated the samples with the collagen peptide or the wild type HA308-317 and found significant T-cell proliferation, compared to exposure to the altered HA308-317 peptide. (Li et al., *supra*, at Ex. 25, pp. 4-5.) But as Dr. Matloubian observes, and Dr. Utz concedes, Li does not show that the T-cells stimulated by the wild hemagglutinin peptide cross-react with the collagen peptide, nor does the article show that T-cells stimulated by collagen will cross-react with the influenza hemagglutinin peptide. (Ex. 27, pp. 6, 10; Tr. 278, 282.)

In response to criticism by respondent's experts, Dr. Utz discusses what level of proof is required to establish molecular mimicry in the literature. (Ex. 27, pp. 8-12; Tr. 313-17.) He argues that respondent's expert's insistence that petitioner provide evidence that unequivocally proves that the same T-cells recognize the relevant mimics is "a ridiculously high bar." (Ex. 27, p. 8.) Instead, Dr. Utz asserts that the data from the literature that he has presented "directly mirrors the Fujinami experiment," and in fact "goes well beyond the Fujinami data," often relied upon by respondent. (Ex. 27, p. 10 (citing Robert S. Fujinami et al., *Molecular Mimicry, Bystander Activation, or Viral Persistence: Infections and Autoimmune Disease*, 19 CLINICAL MICROBIOLOGY REV. 80 (2006) (Ex. 28)); *see also* Tr. 274.) He testified that the paper by Fujinami et al. is a seminal paper on molecular mimicry, demonstrating linear amino acid sequence similarity between myelin basic protein and the hepatitis B viral peptide. (Tr. 312-15.) The authors tested the relevance of this sequence homology by immunizing rabbits with the hepatitis B peptide that resembled the myelin basic protein self antigen, in combination with an adjuvant, to determine whether the animals produced antibodies that were cross-reactive to myelin basic protein. (*Id.* at 315-16; Ex. 27, pp. 9, 11.) This, Dr. Utz explains, is the same experiment as described by Li et al. (Tr. 316.) He emphasizes that the Fujinami paper did not show that the same population of T-cells

recognizes the myelin basic protein and hepatitis B mimic peptide, and that such a showing is not necessary to prove molecular mimicry.  (Ex. 27, pp. 10-11; Tr. 317.)

Dr. Utz responded to Dr. Matloubian's observation that the HLA-DR4/1 molecules are associated with seropositive RA by asserting that medical literature estimates that between 15-37% of seronegative RA patients are seropositive for DR4 or DR1.  (Tr. 890-91 (citing Buhm Han et al., *Fine Mapping Seronegative and Seropositive Rheumatoid Arthritis to Shared and Distinct HLA Alleles by Adjusting for the Effects of Heterogeneity*, 94 AM. J. HUM. GENETICS 522 (2014) (Ex. 64)).)  Dr. Utz estimated that between 15-90% of seronegative RA patients still have the DR4/1 gene, suggesting that petitioner likely has the DR4/1 gene, despite having no RA-associated autoantibodies.  (*Id.* at 902-03.)  Referring to the Hueber et al. article, Dr. Utz noted that the RA patients have a variety of autoantibodies to different antigens and that only some seropositive RA patients will have anti-CCP antibodies.  (Tr. 909-10 (citing Hueber et al., *supra*, Ex. 46, p. 4).)  Hueber et al. found that one RA patient had autoantibodies to citrullinated epitopes, but not to other RA-related peptides, while a second RA patient had minimal reactivity against citrullinated epitopes, but did have reactivity against other RA associated epitopes, such as citrullinated fibrinogen.  (Hueber et al., *supra*, at Ex. 46, fig. 1.)  Dr. Utz asserts that Hueber demonstrates that a significant portion of patients who, like petitioner, are rheumatoid factor negative will have antibodies against citrullinated antigens, which are associated with the HLA-DR4/1.  (Tr. 917 (citing Hueber et al., *supra*, at Ex. 46, fig. 4).)

During the hearing, Dr. Utz also proposed bystander activation as a possible contributory causative mechanism.  (Tr. 232-34.)  Dr. Utz describes bystander activation as activation of memory T-cells by a stimulant, such as a vaccine.  (*Id.* at 221.)  Specific to this case, he testified that the influenza vaccine causes an upregulation of cytokines, which can than activate the T-cells specific to both collagen and influenza.  (*Id.* at 277.)  Dr. Utz further testified that the Li article supports bystander activation for T-cells specific to collagen and influenza, as it shows increases in interferon gamma (IFN-γ) when stimulated to the wild hemagglutinin peptide and the collagen peptide, which could lead to activation of T-cells that could be cross-reactive.  (*Id.* at 276-77 (citing Li et al., *supra*, Ex. 25, p. 5).)  Dr. Utz acknowledged that the Li article does not show that the same T-cell is being stimulated by collagen and hemagglutinin (*Id.* at 278, 282), but that bystander activation is a result of existing T-cells being activated by IFN-γ that were generated by the flu vaccine (*Id.* at 318).

Dr. Utz opines that the timing of petitioner's symptoms to the vaccination was medically appropriate.  (Tr. 319.)  He explains that petitioner developed polyarthralgia the day following the vaccination and her disease evolved "by month eight."  (*Id.* at 401.)  Dr. Utz opines that her initial symptoms immediately after the flu vaccine were the result of an innate immune response to the vaccine.  (*Id.* at 416.)  Specifically, he attributes her initial symptoms of "arthralgias at 24 hours to the cytokines," and then over "days to weeks" the T-cell activation occurred through bystander activation and/or molecular mimicry, which ultimately led to "sustained inflammation that is then going to lead to arthralgias that don't go away."  (*Id.* at 419, 421-22.)

Dr. Utz ultimately concludes that the flu vaccine petitioner received on September 19, 2011, caused her to develop RA through the mechanisms of molecular mimicry and/or bystander activation. (Ex. 20, p. 18; Ex. 27, p. 12; Tr. 243, 318.)

### b. Respondent's Immunology and Rheumatology Expert, Mehrdad Matloubian, M.D., Ph.D.[12]

Respondent submitted two expert reports from Dr. Matloubian prior to the entitlement hearing, as well as a third report after the hearing that specifically addressed Dr. Utz's reliance on the Han et al. and Skinner et al. papers during the entitlement hearing. (Exs. A, C, H.) In his first two reports, Dr. Matloubian initially doubted that petitioner suffered seronegative RA; however, during the hearing, Dr. Matloubian later testified that he ultimately agreed with the diagnosis of seronegative RA. (Tr. 538.) Therefore, the summary of Dr. Matloubian's expert reports and testimony focus on his opinion regarding vaccine causation and its application to petitioner's case.

Dr. Matloubian describes RA as a systemic inflammatory disease with major manifestation of peripheral arthritis, mainly affecting small joints of the hands and feet. (Ex. A, p. 5 (citing Iain B. McInnes & Georg Schett, *The Pathogenesis of Rheumatoid Arthritis*, 365 NEJM 2205 (2011) (Ex. A, Tab 1)); Tr. 514.) He explains that RA is quite common and that it affects women 2-3 times more often than men. (Ex. A, p. 5; Tr. 516-17 (citing Cynthia Crowson et al., *The Lifetime Risk of Adult-Onset Rheumatoid Arthritis and Other Inflammatory Autoimmune Rheumatic Disease*, 63 ARTHRITIS & RHEUMATISM 633 (2011) (Ex. A, Tab 2); James R. O'Dell et al., *Rheumatoid Arthritis*, in CURRENT DIAGNOSIS & TREATMENT: RHEUMATOLOGY (John B. Imboden et al. eds., 3d ed. 2013) (Ex. A, Tab 3)).) Onset of RA typically occurs in the later part of life, between the ages of 50 and 75. (Tr. 516-17 (citing Crowson, *supra*, at Ex. A, Tab 6, p. 5).) Dr. Matloubian asserts that, at 59-years-old, petitioner was at the "peak age of onset" and that, as a woman, she was a higher risk of developing RA. (*Id.* at 592.)

In his supplemental report and during the hearing, Dr. Matloubian explains that there are two distinct subsets of RA: seronegative RA and seropositive RA. Seropositive RA is characterized by positive anti-cyclic citrullinated peptide antibody (anti-CCP) and rheumatoid factor. (Ex. C, p. 5 (citing Vivianne Malmström et al., *The Immunopathogenesis of Seropositive Rheumatoid Arthritis: From Triggering to*

---

[12] Dr. Matloubian received his medical degree and Ph.D. in virology from the University of California, Los Angeles, in 1996. (Ex. B, p. 1.) He went on to the University of California, San Francisco, where he completed an internship and residency in internal medicine, fellowship in rheumatology, and post-doctoral fellowship in immunology. (*Id.* at 1; Tr. 505.) In 2004, Dr. Matloubian accepted a position as an assistant adjunct professor of medicine at the University of California, San Francisco. (Ex. B, p. 2.) He was eventually elevated to full professor of rheumatology. (Tr. 504.) He is board certified in rheumatology, and he maintains an active medical license in California. (Ex. B, p. 1; Tr. 505.) In his clinical capacity, Dr. Matloubian has experience diagnosing and treating patients with rheumatoid arthritis. (Tr. 509-10.) Dr. Matloubian was accepted as an expert in rheumatology and immunology during the entitlement hearing. (*Id.* at 512.)

*Targeting*, 17 NATURE 60 (2017) (Ex. C, Tab 2)).)  Patients who are rheumatoid factor positive have autoantibodies against immunoglobulin G (IgG), which can be acquired through a chronic infection, such as hepatitis C and hepatitis B.  (Tr. 524.)  The anti-CCP antibody has a high affinity for binding to HLA-DR4 risk alleles, which have been associated with RA.  (*Id.* at 524-25; *see also* Malmström et al., *supra*, Ex. C, Tab 2, p. 3.)[13]  Dr. Matloubian notes that RA-associated antibodies can be present in the blood before onset of clinical symptoms.  (Tr. 520.)  During the hearing, Dr. Matloubian explains that Malmström et al. found the HLA-DR4 highly correlates with the development of RA, but did not find a large association with HLA-DR4 in seronegative patients, thus the likelihood of a seronegative RA patient having the HLA-DR4 alleles is extremely low.  (*Id.* at 529-30 (citing Malmström et al., *supra*, at Ex. C, Tab 2, p. 4).)  He also observes that patients with seropositive RA have a more severe disease, whereas seronegative RA patients have less joint destruction and a milder disease course, making it unlikely that they have the HLA-DR4 gene.  (*Id.* at 530 (citing Malmström et al., *supra*, at Ex. C, Tab 2, p. 2).)  He asserts that Dr. Utz attempted to conflate the two types of RA, and emphasized that the authors of the Han article Dr. Utz referred to during the hearing also stress the important distinction between seropositive RA and seronegative RA.  (Ex. H, p. 2 (citing Han et al*. supra*, at Ex. 64, p. 1.).)

Dr. Matloubian explains that the underlying cause of RA is not known, although some have postulated that viruses can cause RA because "some viruses do cause an inflammatory arthritis."  (Tr. 534.)  McInnes et al. wrote that RA "involves a complex interplay among genotype, environmental triggers, and chance," but the cause is unknown.  (McInnes & Schett, *supra*, Ex. A, Tab 1, p. 1.)  The same article suggests that infectious agents, such as Epstein-Barr virus, cytomegalovirus, proteus species, and *E.coli*, have been linked with RA, and "although unifying mechanisms remain elusive, some form of molecular mimicry is postulated."  (*Id.* at 2.)

Dr. Matloubian disputes Dr. Utz's theory that the flu vaccine can cause RA through the mechanism of molecular mimicry.  (Ex. A, p. 12; Ex. C, p. 5.)  Dr. Matloubian acknowledges that molecular mimicry is a recognized proposed mechanism for infection-induced autoimmunity.  (Ex. A, p. 9; Tr. 594-95.)  However, he asserts that if molecular mimicry were a plausible explanation for how the flu vaccine can cause RA, then the flu virus should also be capable of triggering the disease.  (Ex. A, p. 9; Ex. C, p. 5; Tr. 593.)  In support of his position, Dr. Matloubian conducted a search of the medical literature addressing a role for molecular mimicry in the pathogenesis of RA.  (Ex. A, pp. 10-12.)  Dr. Matloubian found that several review articles were critical of the data on

---

[13] Malmstrom wrote that "a major gene-environment interaction was demonstrated between distinct HLA-DR variants and exposure to smoke and other agents such as silica dust, and this interaction was specific for the ACPA-positive subset of RA." After acknowledging the well-known connection between smoking and RA, Dr. Matloubian explains that smoking causes inflammation in the lungs, resulting in upregulation of enzymes that generate citrulline. This process can happen in anyone, but people with HLA-Dr4 alleles "will then bind these citrullinated peptides, show them as a foreign peptide, and cause autoimmunity."

molecular mimicry, with some articles going so far as to argue against the plausibility of molecular mimicry as a causal mechanism for RA.  (*Id.* at 10 (citing Janet M. Davies, *Molecular Mimicry: Can Epitope Mimicry Induce Autoimmune Disease?*, 75 IMMUNOLOGY & CELL BIOLOGY 113 (1997) (Ex. A, Tab 13); N.R. Rose & I.R. Mackay, *Molecular Mimicry: A Critical Look at Exemplary Instances in Human Disease*, 57 CELLULAR & MOLECULAR LIFE SCIS. 542 (2000) (Ex. A, Tab 14); Kuniaki Terato et al., *Slipping Through the Cracks: Linking Low Immune Function and Intestinal Bacterial Imbalance to the Etiology of Rheumatoid Arthritis*, AUTOIMMUNE DISEASES, 2015 (Ex. A, Tab 15)).)  He cites a review article by Rose & Mackay, which described studies suggesting possible associations between RA and Epstein-Barr virus, *M. tuberculosis*, and *E. coli* through the mechanism of molecular mimicry but finding none of the evidence to be substantial.  (Rose & Mackay, *supra*, at Ex. A, Tab 14, p. 6.)  Based on his search results, Dr. Matloubian identified only 26 articles that included experiments testing whether molecular mimicry is relevant to the pathogenesis of RA; however, although he has not provided any citations to these articles, he asserts that they "did not contain any persuasive evidence to support molecular mimicry for RA."  (Ex. A, p. 10.)  Moreover, although Dr. Matloubian contends there is "relatively good data" to suggest molecular mimicry between the *P. gingivalis* bacteria, which causes periodontitis, and citrullinated peptides in seropositive RA, he notes that this hypothesis would not be relevant to seronegative RA patients.  (Tr. 600-01 (citing Malmström et al., *supra*, at Ex. C, Tab 2, p. 4).)  He emphasizes that "none of the primary or review articles mentioned molecular mimicry to the influenza virus or the components of the influenza vaccine as a possible cause of RA."  (Ex. A, p. 11.)

Dr. Matloubian states that the epidemiological evidence does not support an association between the development of RA and the flu vaccine.  (Ex. A, pp. 13-14.)  Bengtsson et al. examined whether vaccines were associated with an increased risk of RA, and found that "vaccinations commonly used in adults administered within 5 years before onset of disease did not increase the risk of RA overall or the risk of two major subgroups of RA."  (Camilla Bengtsson et al., *Common Vaccinations Among Adults Do Not Increase the Risk of Developing Rheumatoid Arthritis: Results from the Swedish EIRA Study*, 69 ANNALS RHEUMATIC DISEASES 1831 (2010) (Ex. A, Tab 25).)  Dr. Matloubian observes that the Bengtsson article found that even those with established risk factors for RA, such as genetic markers or smoking, did not have a greater chance of developing RA up to five years after vaccination.  (Ex. A, p. 13 (citing Bengtsson et al., *supra*, at Ex. A, Tab 25, p. 2).)  Further, the authors explained, "our results indicate that immunological provocation of adults with common vaccines in their present form is not a major risk factor for RA."  (Bengtsson et al., *supra*, at Ex. A, Tab 25, p. 3.)

Beyond the lack of association between vaccines and the development of RA, Dr. Matloubian also identifies two significant flaws underlying Dr. Utz's opinion.  First, Dr. Matloubian explains that Dr. Utz's opinion is reliant on T-cells binding to the HLA-DR4 peptide on both the influenza peptide and collagen peptide, but the HLA-DR4 is associated with seropositive RA, not seronegative RA.  (Ex. C, p. 7; Ex. H, p. 1; Tr. 684.)  Thus, Dr. Matloubian asserts that because petitioner is anti-CCP negative, "it's

highly unlikely for her to be HLA-DR4-positive." (Tr. 683-84.) Therefore, Dr. Matloubian asserts that Dr. Utz's proposed mechanism is not applicable to this case. (Ex. C, p. 7.)

The second issue with Dr. Utz's molecular mimicry theory involves the lack of evidence to suggest that T-cells activated by the hemagglutinin peptide cross-react with RA peptides. (Ex. C, pp. 7-8.) Dr. Matloubian agrees that the MHC HLA-DR4/1 molecules can bind to either the influenza hemagglutinin peptide or the Type II collagen peptide, as asserted by Dr. Utz, but he argues that simply binding to the same HLA site does not translate to activated T-cells being able to cross-react. (*Id.*; Tr. 628, 655-65.) Discussing the Li article, Dr. Matloubian explains that the authors found that RA patients have either collagen specific or influenza hemagglutinin specific T-cells, but did not show that the same T-cells responded to both collagen and influenza hemagglutinin. (Ex. C, p. 10; Tr. 654-56 (citing Li et al., *supra*, at Ex. 25, pp. 4-5).) Further, Dr. Matloubian observes that Li et al. did not test collagen specific T-cells to see if those same T-cells can cross-react with hemagglutinin, as Dr. Utz asserts. (Ex. C, p. 10; Tr. 656).

Instead, Dr. Matloubian argues that T-cells in RA are more specific to RA-identified antigens, such as Type II collagen or citrullinated protein, and references several articles to support his position. (Tr. 668-77.) Specifically, he refers to the Svendsen article, which examined collagen specific or influenza hemagglutinin specific T-cells and found that "T cells that are specific for collagen don't recognize hemagglutinin peptides with HLA-DR4, and T cells that are specific for hemagglutinin don't recognize HLA-DR4 or collagen." (*Id.* at 670 (citing Pia Svendsen et al., *Tracking of Proinflammatory Collagen-Specific T Cells in Early and Late Collagen-Induced Arthritis in Humanized Mice*, 173 J. IMMUNOLOLOGY 7037 (2004) (Ex. F, Tab 5)).) James et al. also examined T-cell specificity in RA and found distinct population of influenza-specific CD4+ T-cells and citrullinated peptide-specific T-cells in RA patients, which Dr. Matloubian asserts demonstrates that T-cells are only responding to "whatever peptide they stimulated them with, but there is no cross-reactivity with hemagglutinin." (*Id.* at 675 (citing Eddie A. James et al., *Citrulline-Specific Th1 Cells are Increased in Rheumatoid Arthritis and Their Frequency is Influenced by Disease Duration and Therapy*, 66 ARTHRITIS & RHEUMOLOGY 1712 (2014) (Ex. F, Tab 4)).)

Dr. Matloubian also disagreed with Dr. Utz's bystander activation theory as a causal mechanism for the flu vaccine to cause RA. (Tr. 680.) He states that if Dr. Utz's bystander mechanism was true, he "would expect to see rheumatoid arthritis happening after other infections, including influenza virus infection," as infection results in a more severe increase in cytokine activity than vaccination; however, RA has not been found to be casually associated with flu infection or other viruses. (*Id.* at 680-81.) To that point, Dr. Matloubian questioned why the flu vaccine would result in a greater increase of cytokine production compared to petitioner's demonstrated bacterial infection. (*Id.* at 681.)

Dr. Matloubian asserts that petitioner had a history of polyarthralgia prior to the September 19, 2011 vaccination and that she was at "peak age" for the development of

RA. (Ex. C, p. 12; Tr. 592.)  He opines that petitioner's course of RA was mild and that it was consistent with how RA naturally progresses. (Tr. 590-91.)  He ultimately concluded that the flu vaccine did not cause petitioner's seronegative RA and that the mechanisms proposed by Dr. Utz are not supported by the evidence.

### c.  Respondent's Immunology Expert, J. Lindsay Whitton, Ph.D.[14]

Respondent also relied upon the opinion of Dr. Whitton, an immunologist, to support his position that the flu vaccine cannot cause seronegative RA. (Exs. D, I; Tr. 719-881.)  Although Dr. Whitton mostly defers to Drs. Matloubian and Utz's opinions regarding the petitioner's diagnosis, he notes in his first report that petitioner did seek treatment for pain in her arms, legs, and neck in September 2010. (Ex. D, p. 2.)  However, to answer the question of whether the flu vaccine could cause RA, Dr. Whitton bases his opinion on the assumption that petitioner has seronegative RA. (*Id.*)

In his report. Dr. Whitton agrees with Dr. Matloubian's assertion that the lack of epidemiologic support for an association between the flu virus and RA suggests that any association between the flu vaccine and RA is unlikely. (Ex. D, pp. 2-3.)  He also notes, again agreeing with Dr. Matloubian, that epidemiological studies have not found an association between the flu vaccine and RA. (*Id.*)  Dr. Whitton quotes an article by Westra et al. article that examined both the efficacy and the safety of vaccines for patients with autoimmune inflammatory rheumatic diseases (AIRDs), including RA, which provides:

> Although several studies have found that autoantibody titres increase in some patients with AIRD after influenza vaccination, other studies could not confirm these findings, and in the majority of cases this increase in autoantibody titre was not associated with clinical disease activity. . . . Also, in pre-post studies after influenza vaccination, patients with RA did not experience increased disease activity.

(*Id.* at 3 (internal citations omitted) (quoting Johanna Westra et al., *Vaccination of Patients with Autoimmune Inflammatory Rheumatic Diseases*, 11 NATURE REVS. RHEUMATOLOGY 135 (2015) (Ex. A, Tab 30, p. 6)).)  In response to Dr. Utz's contention that the incidence of flu vaccine-caused RA is so rare that it is beyond the power of any epidemiologic survey to detect, Dr. Whitton explains that such a hypothesis would be, by definition, impossible to test. (*Id.*)  He notes, instead, that there is substantial evidence to demonstrate that neither flu vaccine nor the flu virus can cause RA. (*Id.* at 3-4.)

---

[14] Dr. Whitton received his medical degree and Ph.D. from the University of Glasglow, Scotland, in 1979 and 1984, respectively, before going on to accept a position as a senior research assistant in the Department of Immunology at Scripps Clinic in California. (Ex. E, p. 1.)  He was eventually elevated to professor in 1998. (*Id.*)  Since 2017, Dr. Whitton has maintained a position as a professor in the Department of Immunology and Microbiology at Scripps Research Institute. (*Id.*)  He has nearly 200 publications and maintains a position on the editorial board of several journals. (*Id.* at 1-15.)  Dr. Whitten was proffered as an expert in immunology and virology without objection. (Tr. 745-46.)

During the hearing, Dr. Whitton described molecular mimicry as a process by which a microbe from an infectious agent or vaccine can trigger a T-cell response and the T-cell response to the microbe is capable of cross-reacting with an epitope from a host protein due to the similarity of the shared structure between the microbe and host tissue.  (Tr. 773-75.)  Dr. Whitton then addresses Dr. Utz's theory of molecular mimicry between the flu vaccine and RA, stating that the articles Dr. Utz relies upon do not demonstrate that different peptides can activate the same T-cell or antibody.  (Ex. D, p. 4.)  Criticizing Dr. Utz's interpretation of the Sun et al. article, Dr. Whitton writes that the authors demonstrate that an altered hemagglutinin peptide can bind to the MHC HLA-DR4 region of a T-cell, which inhibited the activation of RA-related T-cells.  (*Id.* (citing Sun et al., *supra*, Ex. 14).)  Dr. Whitton explains that for a T-cell to be activated, it needs to "see" two things: "(i) a specific antigenic peptide sequence (which differs from one T cell to the next) that (ii) is being 'presented' to the T cell by a major histocompatibility complex (MHC) molecule."  (*Id.*)  But Sun et al. only demonstrates that the hemagglutinin peptide binds to the MHC HLA-DR4 region, the T-cell could not "see" the specific antigenic peptide sequence, and as a result, the T-cell was not activated.  (*Id.*)  He testified that, for T-cell molecular mimicry, "binding of a peptide to an MHC molecule is required for molecular mimicry but [it] is not sufficient.  You have to have the T cell response on top of it."  (Tr. 777.)  Dr. Whitton agrees with Dr. Matloubian's criticism of Sun et al., stating that the article does not demonstrate that the hemagglutinin peptide can activate the same T-cell that can recognize both Type II collagen and the influenza antigen.  (Ex. D, p. 4.)

Further, Dr. Whitton also agrees with Dr. Matloubian that Dessen et al. and Li et al. do not advance Dr. Utz's molecular mimicry theory.  Dr. Whitton noted that Dessen et al. article shows that "a specific T cell (in this case, carrying a receptor designated [T-cell receptor] HA1.7) can cross-react with a particular flu peptide when that peptide is presented by either HLA DR1 or HLA DR4," but it does not demonstrate relevance to RA, as the paper "does not show any data regarding T cell or antibody responses to collagen peptides."  (Ex. D, p. 5 (citing Hennecke & Wiley, *supra*, at Ex. 24).)  With respect to the Li article, Dr. Whitton asserts that it does not show T-cells specific to RA antigens can respond to influenza antigens or that T-cells specific to the influenza virus respond to RA antigens.  (*Id.* at 6.)

For T-cell molecular mimicry to work, there must be some level of sequence homology between the antigen and self-antigen.  (*Id.* at 818.)  However, Dr. Whitton asserts that the sequences of hemagglutinin and Type II collagen, as identified in Hennecke & Wiley and Dessen et al. articles, are not similar enough to generate T-cell cross-reactivity.  During the hearing, Dr. Whitton testified that the Birnbaum et al. article explains how T-cell promiscuity requires T-cell receptors (TCRs) to be able to identify relatively homologous peptides and through their experiment, found that

> [T-cell receptor] cross-reactivity is not achieved by each receptor recognizing a large number of unrelated peptide epitopes, but rather through greater tolerance for substitutions to peptide residues outside of the

[T-cell receptor] interface, differences in residues that contact the MHC, and relatively conservative changes to the residues that contact the [T-cell receptor] [complementary-determining region] loops.

(Michael E. Birnbaum et al., *Deconstructing the Peptide-MHC Specificity of T Cell Recognition*, 157 CELL 1073 (2014) (Ex. 39); *see also* Tr. 827-28.)  He also referenced his own experiment, which examined T-cell cross-reactivity, and explained that, when using two relatively similar virus strains with only limited changes in the sequences, he was able to induce T-cells, but that the T-cells differed in their ability to cross-react with the other strain.  (Tr. 828-33 (citing J. Lindsay Whitton et al., *Molecular Analyses of a Five-Amino-Acid Cytotoxic T-Lymphocyte (CTL) Epitope: An Immunodominant Region Which Induces Nonreciprocal CTL Cross-Reactivity*, 63 J. VIROLOGY 4303 (1989) (Ex. F, Tab 11)).)  Dr. Whitton stated that this experiment demonstrated T-cell receptor promiscuity is real, but given that T-cells generated by one viral strain could not cross-react with another, it suggests that there is some specificity required for T-cell receptors to recognize a peptide and a "small change in one or two amino acids can make the peptide invisible to T-cells." (*Id.* at 832.)  He ultimately concluded that, due to the differences in the sequences of the hemagglutinin peptide and Type II collagen peptide, the likelihood of T-cell cross-reactivity was extremely low.  (*Id.* at 811-12.)

Dr. Whitton also responded to Dr. Utz's theory that the flu vaccine could have triggered petitioner's RA through the mechanism of bystander activation.  (Tr. 873.)  He agreed with Dr. Utz's explanation that bystander activation occurs when T-cells react to a virus or antigen, secrete cytokines, and then trigger responses from non-specific T-cells, which then attack self-antigens.  (*Id.* at 873-74.)  Dr. Whitton testified that most T-cells are antigen specific, but he conceded that bystander activation can occur, albeit rarely.  (*Id.*)

With respect to the onset of petitioner's RA, Dr. Whitton asserted that it would be "almost inconceivable" for onset of symptoms to occur 24-hours after the flu vaccination if the mechanism was molecular mimicry.  (Tr. 878-79.)  He opined that onset of disease symptoms through the mechanism of molecular mimicry would occur within a "minimum of seven days and up to about six-weeks."  (*Id.*)

## V.  Analysis

### a.  *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," demonstrating that the vaccine received can cause the type of injury alleged.  *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (citations omitted).  Such a theory must only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994).  Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory.  *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367,

1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)).  However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [her] theory.  While it does not require medical or scientific certainty, it must still be 'sound and reliable.'"  *Boatmon*, 941 F.3d at 1359 (internal citation omitted) (quoting *Knudsen*, 35 F.3d at 548-49).

RA is an autoimmune condition with a pathogenesis that is not fully understood. (Sekine et al., *supra*, at Ex. 26, p. 1; Hueber et al., *supra*, at Ex. 46, p. 1; *see also* McInnes & Schett, *supra*, at Ex. A, Tab 1, pp. 1-2.)  RA is characterized by joint swelling, joint tenderness, and destruction of synovial joints, which can lead to severe disability.  (Daniel Aletaha et al., *2010 Rheumatoid Arthritis Classification Criteria*, 62 ARTHRITIS & RHEUMATISM 2569 (2010) (Ex. 11); *see also* McInnes & Schett, *supra*, at Ex. A, Tab 1, p. 1.)  RA typically develops later in life, with women having a higher risk than men for developing RA.  (McInnes & Schett, *supra*, at Ex. A, Tab 1, p. 2; Crowson, *supra*, Ex. A, Tab 2, p. 3).)  There are a number of risk factors associated with the development of RA, including smoking and periodontitis, along with genetic susceptibility.  (McInnes & Schett, *supra*, at Ex. A, Tab 1, pp. 2, 4.)

RA patients can be divided into two main categories based on the presence or absence of autoantibodies specific for autoantigens modified by citrullination ("ACPA"), such as anti-CCP antibodies, and autoantibodies specific for self IgG-Fc (rheumatoid factor).  (Malmström et al., *supra*, at Ex. C, Tab 2, p. 1; Han et al., *supra*, at Ex. 64, p. 1).)  Seropositive RA patients, those with positive ACPA and rheumatoid factor antibodies, make up two-thirds of RA cases.  (Malmström et al., *supra*, at Ex. C, Tab 2, p. 1.)  Genetic studies have identified an association of seropositive RA with the HLA-DR1/4 alleles.  (*Id.* at 5-7; Ex. C, p. 7.)  Seropositive RA patients can have circulating ACPA and rheumatoid factor autoantibodies prior to the development of clinical symptoms of RA.  (Aletaha et al., *supra*, at Ex. 11, p. 3; McInnes & Schett, *supra*, at Ex. A, Tab 1, p. 3; Malmström et al., *supra*, at Ex. C, Tab 2, pp. 2, 5.)  The experts in this case agree that petitioner has seronegative RA, demonstrating no positive ACPAs or rheumatoid factor autoantibodies.[15]

Petitioner's theory of vaccine causation, as presented by Dr. Utz, is primarily based on molecular mimicry between the flu vaccine and RA self-antigens. (Ex. 9, pp. 6-11; Ex. 20, pp.10-17; Ex. 27, pp. 8-9.)  Dr. Utz also postulates that the flu vaccine could cause RA through bystander activation.  (Tr. 220-22, 233-34, 477.)

---

[15] Anti-CCP assays recognize several self-proteins, including α-enolase, keratin, fibrinogen, fibronectin, collagen, and vimentin.  (McInnes & Schett, *supra*, at Ex. A, Tab 1, p. 2.)  Dr. Utz testified that petitioner underwent two CCP tests but "not all of the citrullinated proteins that are targets in RA work for that assay, so you can miss some of them."  (Tr. 194-95.)  He later cited Hueber (Ex. 46) to explain that the anti-CCP assay does not detect all of the "hundreds of citrullinated peptides . . . that are thought to be clinically important."  (*Id.* at 378-80.)  While it may be a reasonable caveat to note that using anti-CCP assays to screen for ACPA positivity, which is the generally accepted methodology (*see* Han et al., *supra*, at Ex. 64), is imperfect, it would still be speculative for petitioner to seek to establish ACPA positivity based on an absence of supportive findings.

Dr. Utz opines that because the influenza hemagglutinin peptide and the Type II collagen peptide can both bind to the MHC HLA-DR4 molecule for T-cell activation, T-cells activated by the hemagglutinin peptide can become autoreactive and recognize RA antigens in the joints.  (Ex. 20, pp. 13, 15-17; Ex. 27, p. 5; Tr. 213-18, 223-28, 246-51, 477.)

Petitioner is not the first petitioner to assert a causal relationship between vaccines, including the flu vaccine, and RA in the Program.  I and other special masters have generally found that there is insufficient evidence to implicate vaccines as a cause or trigger of RA.[16]  Although decisions of other special masters are not binding and do not dictate the outcome in this case, I find these prior cases rejecting a causal relationship to be persuasive.  *See Boatmon*, 941 F.3d at 1358; *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).  Moreover, the specific theory Dr. Utz has presented in this case, seeking to implicate the flu vaccine as a cause of RA via molecular mimicry, has been considered by other special masters and found to be unpersuasive.  *See Tullio*, 2019 WL 7580149, at *15-27; *Hock*, 2020 WL 6392770, at *26-27; *Parker v. Sec'y of Health & Human Servs.*, No. 14-979V, 2019 WL 3425297, at *25-27 (Fed. Cl. Spec. Mstr. June 24, 2019); *see also Moran*, 2021 WL 4853544, at *24-27 (finding that Dr. Zizic's theory of molecular mimicry, which is similar to the theory presented in the instant case, was not a sound and reliable mechanism to demonstrate how the flu vaccine could cause seropositive RA).  As presented in this case, petitioner's theory fares no better than prior cases for several reasons.

---

[16] *See Casazza v. Sec'y of Health & Human Servs.*, No. 17-947V, 2023 WL 6214984, at *10 (Fed. Cl. Spec. Mstr. Aug. 30, 2023) (explaining that "there is no dispute that RA is an autoimmune condition of uncertain cause that generally involves a combination of genetic and environmental factors or stimuli . . . . [but] [v]ery little on this record part from Dr. Gershwin's say-so associates any vaccine with RA whereas much more purports to refute Dr. Gershwin's opinion"); *Powell v. Sec'y of Health & Human Servs.*, No. 20-1726V, 2025 WL 3443590, at *33 (Fed. Cl. Spec. Mstr. Oct. 8, 2025) (describing prior cases finding that petitioner failed to preponderantly show that the flu vaccine can cause RA); *Aultman v. Sec'y of Health & Human Servs.*, No. 21-1802V, 2025 WL 2401983, at *22 (Fed. Cl. Spec. Mstr. July 11, 2025) (citing prior cases denying claims alleging vaccine caused RA); *Maxwell v. Sec'y of Health & Human Servs.*, No. 17-1367V, 2025 WL 1291642, at *29-30 (Fed. Cl. Spec. Mstr. Mar. 26, 2025) (citing cases to support that "Program petitioners asserting RA as a vaccine injury, including seronegative RA, have mostly failed"); *see also Clark v. Sec'y of Health & Human Servs.*, No. 17-1553V, 2023 WL 4897284, at *32 (Fed. Cl. Spec. Mstr. June 16, 2023) (finding that petitioner had not presented a sound and reliable theory to preponderantly show that the flu vaccine can cause RA); *Moran v. Sec'y of Health & Human Servs.*, No. 16-538V, 2021 WL 4853544, at *30 (Fed. Cl. Spec. Mstr. Oct. 4, 2021) (same); *Hock v. Sec'y of Health & Human Servs.*, No. 17-168V, 2020 WL 6392770, at *23-27 (Fed. Cl. Spec. Mstr. Sept. 30, 2020) (same); *Tullio v. Sec'y of Health & Human Servs.*, No. 15-51V, 2019 WL 7580149, at *22 (Fed. Cl. Spec. Mstr. Dec. 19, 2019) (same), *mot. for rev. denied*, 149 Fed. Cl. 448 (2020); *Wilson v. Sec'y of Health & Human Servs.*, No. 17-1264V, 2023 WL 9053671, at *17 (Fed. Cl. Spec. Mstr. Dec. 7, 2023) (same); *Seivwright v. Sec'y of Health & Human Servs.*, No. 19-1398V, 2023 WL 3197267, at *2 (Fed. Cl. Spec. Mstr. May 2, 2023) (same).  *But see Campbell v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 650 (2011) (utilizing a biological plausibility standard, which has since been rejected, to determine entitlement to compensation for flu vaccine caused RA); *H.J. v. Sec'y of Health & Human Servs.*, No. 11-301V, 2015 WL 6848357, at *12 (Fed. Cl. Spec. Mstr. Nov. 6, 2015) (finding that the Tdap vaccine can cause RA in a patient with overlap syndrome and preclinical disease).

First, Dr. Utz's theory of molecular mimicry has limited or questionable applicability to this particular case. His theory is heavily reliant on the influenza hemagglutinin peptide and the Type II collagen peptide recognizing the same MHC HLA-DR4/1 molecule, which will then result in T-cell stimulation and activation. (Ex. 9, p. 11; Ex. 20, pp. 8-17; Ex. 27, pp. 6-8.) However, the HLA-DR4/1 molecules/alleles are associated with seropositive RA, rather than the seronegative RA that is petitioner's diagnosis. (*See* McInnes & Schett, *supra*, at Ex. A, Tab 1, p. 2; *see also* Malmström et al., *supra*, at Ex. C, Tab 2 ("The genetic studies confirmed that MHC class II genes are by far the greatest genetic risk factor for seropositive RA . . . .").) During the hearing, Dr. Utz testified that the Han study shows that 15% to 36% (or 37%) of seronegative RA patients still have DR4 or DR1 molecules. (Tr. 890-91; *see also* Han et al., *supra*, at Ex. 64, p. 8.) However, while the study authors speculate that this minority of seronegative RA patients might actually be seropositive (Han et al., *supra*, at Ex. 64, p. 8; *see also* n. 15, *supra*), the study does not support the notion that the mechanism of autoimmunity for seropositive RA can be carried over to seronegative RA. Instead, the authors explain that their findings "contribute to mounting evidence that ACPA+ and ACPA- RA are distinct diseases with certain unique genetic factors."[17] (*Id.* at 3.) As discussed in *C.P.*, another flu-seronegative RA case, the lack of knowledge regarding the pathogenesis of seronegative RA significantly undermines any reliance on molecular mimicry with regard to that type of RA. *C.P. v. Sec'y of Health & Human Servs.*, No. 14-917V, 2019 WL 5483621, at *26-28 (Fed. Cl. Spec. Mstr. Aug. 21, 2019). And, indeed, Dr. Utz has posited this same theory he advances in this case in prior seropositive RA cases in the Program, albeit likewise unsuccessfully, *see, e.g.*, *Hock*, 2020 WL 6392770, at *4-9, with little that justifies extending that same theory to seronegative cases. Based on my review of the complete record, Dr. Utz has not adequately explained as a threshold matter why it is reasonable to invoke this HLA-DR4/1 molecule-based molecular mimicry in a case of seronegative RA. To the extent Dr. Utz merely suggested that the correlation between seropositive RA and any specific citrullinated epitope is not absolute (Tr. 909-10 (citing Hueber et al., *supra*, Ex. 46, p. 4)), this has the effect of undermining the idea that molecular mimicry would be a reasonable explanation for even seropositive RA more than it supports an extension of molecular mimicry to seronegative RA.

It appears that petitioner seeks to bypass this issue at least in part based on Dr. Utz's additional reliance on bystander activation, stressing that bystander activation does not require structurally similar molecules. (ECF No. 209, pp. 28-30; *see also* Tr. 221-24, 290-304.) However, this too is unpersuasive. Dr. Utz opined that the influenza vaccine causes the upregulation of cytokines, including IFN-γ, which then binds to pre-

---

[17] This conclusion relates to the following observation: "We observed that two amino acid positions, HLA-DRβ1 position 11 (in which serine and leucine conferred risk) and HLA-B position 9 (in which aspartate conferred risk), were driving ACPA RA. These two positions are already known to drive ACPA+ RA as well; however, the specific amino acid residues conferring risk were completely distinct between the two disease subtypes. We also separately tested for associations with ACPA+ disease. In addition to confirming known associations at positions 11, 71, and 74 in HLA-DRβ1, position 9 in HLA-B, and position 9 in HLA-DPβ1, we identified an additional association at amino acid position 77 within the binding groove of HLA-A." (Han et al., *supra*, at Ex. 64, p. 3.)

existing collagen-specific T-cells, activating them and causing them to become autoreactive.  (*Id.* at 221-22, 277.)  Dr. Utz explained that, unlike molecular mimicry, there is no need for structural similarity in bystander activation; the activation of the cytokine is sufficient to activate pre-existing collagen-specific T-cells.  (*Id.* at 222.)  In that regard, Dr. Utz relied on the Li paper to show that the wild hemagglutinin peptide can cause an increase in inflammatory cytokine proliferation, which he suggested could then result in activation of collagen-specific T-cells.  (*Id.* at 277 (citing Li et al, *supra*, at Ex. 25).)  However, Li et al. demonstrate that exposure to the wild hemagglutinin peptide increases proinflammatory cytokines and T-cell proliferation to the hemagglutinin peptide, but does not evidence that T-cells specific to Type II collagen were increased upon exposure.  Additionally, the article by James et al. appears to contradict the possibility that bystander activation could occur by stimulation of the hemagglutinin peptide, as the authors found that when serum of RA patients was stimulated with the hemagglutinin peptide, RA-specific T-cells did not expand.  (James et al., *supra*, at Ex. F, Tab 4, pp. 6-7.)  Further, the authors explained that patients with RA have higher proportion of pre-existing RA-specific T-cells in circulation compared to healthy controls and exposure to certain RA antigens, such as citrulline, leads to an increase in citrulline-reactive T-cells in patients with RA, suggesting "a Th1 response of these autoantigen-specific T cells."  (*Id.* at 7-8.)  Dr. Whitton agreed that bystander activation can occur, but its occurrence is "fairly minimal."  (*Id.* at 874.)  Dr. Whitton opined that "the vast-majority of the observed T cell response is epitope-specific, T cell receptor-driven."  (*Id.*)

Furthermore, Dr. Utz's molecular mimicry theory fails to provide sufficient evidence to suggest that the fact that MHC HLA-DR4 can bind to both the influenza hemagglutinin peptide and Type II collagen peptide based on similar structure therefore indicates that T-cell cross reactivity can occur.  (Ex. 9, p. 11; Ex. 20, pp 11-17.)  There is some basis for Dr. Utz's theory that the hemagglutinin peptide and Type II collagen peptide are similar in structure (Tr. 256-58 (citing Sun et al., *supra*, at Ex. 14)), and both can bind to the MHC HLA-DR4/1 molecules, but the literature he relies upon does not demonstrate that T-cells activated by hemagglutinin peptides are able to recognize RA self-antigens.  However, prior program experience has stressed that, while the identification of structural similarity may be viewed as a starting point for molecular mimicry, that "does not necessarily mean the similarity has significance to the immune system."  *Tullio*, 2019 WL 7580149, at \*15; *see also Caredio ex rel. D.C. v. Sec'y of Health & Human Servs.*, No. 17-0079V, 2021 WL 4100294, at \*31 (Fed. Cl. Spec. Mstr. July 30, 2021) ("[D]emonstration of homology alone is not enough to establish a preponderant causation theory." (emphasis omitted) (citing *Schultz v. Sec'y of Health & Human Servs.*, No. 16-539V, 2020 WL 1039161, at \*22 n.24 (Fed. Cl. Spec. Mstr. Jan. 24, 2020))), *mot. for rev. denied*, No. 17-79V, 2021 WL 6058835 (Fed. Cl. Dec. 3, 2021).  Thus, to credibly invoke molecular mimicry, petitioners must move beyond homology and provide some further evidence to support cross-reaction.  For example, in *Brayboy*, an omnibus proceeding addressing autoimmune premature ovarian insufficiency, the special master found it sufficient that the petitioners had, more robustly, "identified cross-reaction between components of the vaccine and proteins in the body that are directly responsible for the health and productivity of the organ at

issue," while also noting that further requiring additional steps, or insisting on direct, testable evidence would impermissibly heighten petitioner's burden of proof. *Brayboy v. Sec'y of Health & Human Servs.*, No. 15-183V, 2021 WL 4453146, at *19 (Fed. Cl. Spec. Mstr. Aug. 30, 2021); *see also W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1361 (Fed. Cir. 2013) (finding the special master was reasonable in weighing the lack of evidence of cross-reactivity in evaluating petitioner's molecular mimicry theory).

In the experiment run by Sun et al., they use an altered hemagglutinin peptide to bind more tightly to the HLA-DR4 molecule and to prevent the collagen peptide from activating collagen-specific T-cells. (Tr. 640-643 (discussing Sun et al., *supra*, at Ex. 14).) Dr. Matloubian explained that the altered hemagglutinin peptide removed the T-cell receptor contact residues so the T-cell could not be activated by the hemagglutinin peptide, and additionally, collagen peptides were unable to be presented to antigen presenting cells, and collagen-specific T-cells were not activated. (*Id.*) The Sun paper ultimately provides support for respondent's position that recognition by the same MHC HLA molecule is not sufficient on its own to demonstrate that a T-cell activated by the influenza hemagglutinin can also recognize a collagen peptide (*Id.* at 643), a point which Dr. Utz concedes (Ex. 27, p. 10; Tr. 282). The Li et al. article also does not demonstrate that T-cells activated by influenza hemagglutinin can recognize the collagen peptide, resulting in RA. In Li et al., the authors took the serum from RA patients and examined T-cell proliferation to stimulation by Type II collagen, wild influenza peptides, and the modified hemagglutinin peptide, and found that the altered hemagglutinin peptides were weak stimulators of T-cells in patients with RA. (Li et al, *supra*, at Ex. 25, p. 4.) T-cell proliferation to the wild hemagglutinin peptide was substantially higher (*Id.*), but as Dr. Matloubian observed, the authors did not examine if the T-cells responding to the wild hemagglutinin peptide were collagen-specific T-cells or circulating influenza T-cells. (Tr. 653-57; Ex. C, pp. 9-11.)

By contrast, Dr. Matloubian offered two papers that contradict Dr. Utz's theory that hemagglutinin peptides can recognize RA specific peptides and become activated. Notably, Svendsen et al. examined T-cell activation in RA and found that, when the HLA-DR4 molecules were bound with either Type II collagen or hemagglutinin, the HLA-DR4 molecules with hemagglutinin only bound to hemagglutinin-specific T-cell hybridomas, but not to Type II collagen-specific T-cell hybridomas, suggesting that hemagglutinin-specific T-cells distinguish between the different peptides attached to the MHC HLA molecule and are unable to recognize the other peptides bound to the molecule. (Svendsen et al., *supra*, at Ex. F, Tab 5, p. 3.) James et al. also found that when serum of RA patients was stimulated with flu hemagglutinin peptides, no citrulline-reactive T-cells were detected, but stimulation of citrullinated peptides elicited a detectable population of citrulline-reactive CD+4 T-cells. (James et al., *supra*, at Ex. F, Tab 4.) Taken together, these two articles support respondent's contention that T-cells recognizing the hemagglutinin peptide do not also recognize the collagen peptide. (Ex. C, p. 11; Tr. 669-72, 675-77.)

Petitioner stresses that molecular mimicry is well accepted in this program. (ECF No. 209, pp. 21-22.) However, there have been limitations to the acceptance of the

theory as a mechanism.  In sum, though it is a valid concept in general, it does not readily apply to all autoimmune conditions.  *See Pierson v. Sec'y of Health & Human Servs.*, No. 17-1136V, 2022 WL 322836, at \*24-26 (Fed. Cl. Spec. Mstr. Jan. 19, 2022) (discussing when molecular mimicry has been found to be insufficient to satisfy *Althen* prong one); *Brayboy*, 2021 WL 4453146, at \*19; *W.C.*, 704 F.3d at 1360-61.  Though petitioner's theory of causation need not be medically or scientifically certain, it must be informed by a "sound and reliable" medical or scientific explanation.  *Boatmon*, 941 F.3d at 1359; *see also Knudsen*, 35 F.3d at 548-49.  Without more, the fact that molecular mimicry is mentioned as a *possible* mechanism of RA in some of the literature does not carry petitioner's burden under *Althen* prong one.  The articles petitioner cites as supportive for demonstrating molecular mimicry do not implicate influenza virus or the flu vaccine as possible causative agents.  Instead, other infectious agents, such as Epstein-Barr virus, *E.coli*, *Porphyromonas gingivalis*, *Mycobacterium tuberculosis*, or certain strains of *pneumoniae*, through the mechanism of molecular mimicry, are discussed.  (*See* Terato et al., *supra*, at Ex. A, Tab 15, p. 3; Rose & Mackay, *supra*, at Ex. A, Tab 14, p. 6.)  Further, these and other articles filed in this case explain that the pathogenesis of RA is not well understood.  (Terato et al., *supra*, at Ex. A, Tab 15, p. 1 ("The pathogenesis and disease causative antigen(s) of autoimmune diseases . . . such as rheumatoid arthritis (RA) remain elusive regardless of extensive studies . . . ."); McInnes & Schett, *supra*, at Ex. A, Tab 1, p. 1 ("The cause of rheumatoid arthritis is unknown . . . ."); Svendsen et al., *supra*, at Ex. F, Tab 5, p. 1 ("The pathogenesis of RA is not well understood, but the HLA-DR association strongly suggests that it is Th cell dependent . . . .").)  As in *Hock* and *Moran*, apart from identifying the HLA-DR4/1 molecule to which both the hemagglutinin and Type II collagen peptides can bind, petitioner is unable to demonstrate how the binding of different peptides to the same HLA-DR4/1 molecule results in cross-reactive T-cells that can recognize RA peptides in the body, leading to RA.  *See Moran*, 2021 WL 4853544, at \*24-27; *Hock*, 2020 WL 6392770, at \*26-27.  Furthermore, petitioner's theory of molecular mimicry relies on the presence of the HLA-DR4/1 allele, which is strongly associated with seropositive RA, and not with seronegative RA.  (Malmström et al., *supra*, at Ex. C, Tab 2, p. 3 ("The genetic studies confirmed that MHC class II genes are by far the greatest genetic risk factor for seropositive RA . . . .").)

Additionally, the shortcomings of Dr. Utz's theory come into sharper relief when considering that no association between the flu vaccine and RA was found in several large studies submitted by respondent.  While petitioner need not present epidemiology to meet her burden of proof, *Capizzano*, 440 F.3d at 1325, "[n]othing in *Althen* or *Capizzano* requires the Special Master to ignore probative epidemiological evidence that undermines petitioner's theory," *D'Toile v. Sec'y of Health & Human Servs.*, 726 F. App'x 809, 811 (Fed. Cir. 2018).  Thus, "where such evidence is submitted, the Special Master can consider it in reaching an informed judgment as to whether a particular vaccination likely caused a particular injury."  *Andreu*, 569 F.3d at 1379.

The study by Ray et al. examined the risk of developing RA following vaccination against tetanus, flu, and hepatitis B.  (Paula Ray et al., *Risk of Rheumatoid Arthritis Following Vaccination with Tetanus, Influenza and Hepatitis B Vaccines Among*

*Persons 15-59 Years of Age*, 29 VACCINE 6592 (2011) (Ex. A, Tab 24).) The authors initially noted a "possible association" between RA and influenza vaccine within six months and one year after vaccination, but after performing additional case control analysis, the authors found no association. (*Id.* at 5.) Similarly, the Bengtsson case-control study also found no association between the development of RA and vaccination. (Bengtsson et al., *supra*, at Ex. A, Tab 25.) Additionally, respondent filed a study by Fomin et al., which assessed the safety of the flu vaccine in patients already diagnosed with RA and found that "vaccination against influenza was not associated with a significant worsening of any clinical or laboratory index of disease activity." (I. Fomin et al., *Vaccination Against Influenza in Rheumatoid Arthritis: The Effect of Disease Modifying Drugs, Including TNFα Blockers*, 65 ANNALS RHEUMATIC DISEASES 191 (2006) (Ex. A, Tab 28, p. 3).)

The case reports cited by petitioner provide very limited support for petitioner's theory that the flu vaccine can cause RA as the clinical courses described in these reports can be distinguished from petitioner's course. Moreover, case reports "do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value," even though they are not entirely devoid of evidentiary value. *Paluck v. Sec'y of Health & Human Servs.*, 104 Fed. Cl. 457, 475 (2012) (quoting *Campbell v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 650, 668 (2011)), *aff'd*, 786 F.3d 1373 (Fed. Cir. 2015); *see also Crutchfield v. Sec'y of Health & Human Servs.*, No. 09-0039V, 2014 WL 1665227, at *19 (Fed. Cl. Spec. Mstr. Apr. 7, 2014) (explaining that "single case reports of Disease X occurring after Factor Y . . . do not offer strong evidence that the *temporal* relationship is a *causal* one—the temporal relationship could be pure random chance"), *aff'd*, 125 Fed. Cl. 251 (2014). For example, the case report by Brown & Bertouch describes three patients who received the flu vaccine and thereafter developed morning stiffness and pain in the larger joints, such as shoulders, knees, and hips. (M.A. Brown & J.V. Bertouch, *Rheumatic Complications of Influenza Vaccination*, 24 AUSTRALIAN & N.Z. J. MED. 572 (1994) (Ex. 37).) One of the patients also developed an erythematous rash. (*Id.*) All three patients experienced a resolution of their symptoms within nine months of their vaccination. (*Id.*) The authors did not present any theories regarding a mechanical cause of the patients' symptoms and could only suggest a temporal association between the vaccination and onset of symptoms.

Ultimately, an autoimmune pathogenesis is not inherently suspicious for vaccine causation. There are various pathways to autoimmunity and many autoimmune conditions have little to no suspicion of vaccine causation. *E.g.*, *Kelly v. Sec'y of Health & Human Servs.*, No. 16-1548V, 2023 WL 3274159, at *9 (Fed. Cl. Spec. Mstr. May 5, 2023) (explaining that "[t]here is little debate that myasthenia gravis is an autoimmune neuromuscular disorder and there is little debate that molecular mimicry is, in general, a viable theory of autoimmunity that can in at least some contexts implicate vaccination. Importantly, however, these predicates are not enough to meet petitioner's burden of proof."); *Casazza*, 2023 WL 6214984, at *10 (explaining "there is no dispute that RA is an autoimmune condition of uncertain cause" and that [v]ery little on this record apart from Dr. Gershwin's say-so associates any vaccine with RA whereas much more purports to refute Dr. Gershwin's opinion"). Overall, given the understanding that the

cause of RA is unknown and the literature filed in this case indicating that RA is a combination of environmental and genetic factors that lead to clinical manifestations, the record in this case fails to preponderantly show that the flu vaccine or any vaccine can be an environmental factor that can lead to RA symptoms.  (Malmström et al., *supra*, at Ex. C, Tab 2, p. 5 ("[L]ongitudinal studies of historical serum biobanks have shown that various RA-associated antibodies can be present in the serum long before the onset of joint inflammation."); James et al, *supra*, at Ex. F, Tab 4, p. 6 ("[W]e have observed that citrulline-specific T-cells are present in RA patients and healthy controls.  This observation is consistent with studies of other self-antigens and suggests that possessing a susceptible HLA haplotype is sufficient to generate a self-reactive CD4+T cell repertoire.").)  Dr. Utz has *not* preponderantly established on petitioner's behalf that the flu vaccine can cause seronegative RA via sound and reliable scientific explanation.

Accordingly, for all the reasons discussed above and upon consideration of the record as a whole, petitioner has not met her burden under *Althen* prong one of showing by preponderant evidence that the flu vaccine can cause RA.

### b.  *Althen* prong three

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged.  *Althen*, 418 F.3d at 1278.  That term has been equated to the phrase "medically-acceptable temporal relationship."  *Id.* at 1281.  A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact."  *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).  The explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause the alleged injury (*Althen* prong one's requirement).  *Id.*; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877, at *26 (Fed. Cl. Spec. Mstr. May 30, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

In this case, the parties disagree as to when petitioner's symptoms began, with respondent arguing that petitioner's initial RA symptoms began prior to vaccination and petitioner arguing that she experienced initial arthralgias one day after the September 19, 2011 flu vaccination, but that her symptoms of RA began seven days post-vaccination.  (ECF No. 209, pp. 2-3; ECF No. 212, pp. 29-30; ECF No. 219, pp. 7-8, 26.)  Petitioner attempts to counter respondent's contention that her RA symptoms predated the subject vaccination by detailing her prior medical encounters, which she asserts are consistent with mono-arthralgia of the lumbar spine, rather than polyarthralgia.  (ECF No. 219, pp. 1-6.)  She notes that her medical records lack any evidence or complaints of either small or medium joint tenderness or joint swelling consistent with polyarthralgia.  (*Id.* at 2-6.)  Instead, she asserts that her pre-vaccination medical records demonstrate that she suffered "a fairly stable osteoarthritis of her spine

(degenerative disc disease) and her right knee." (*Id.* at 7.)  However, petitioner's explanation of her pre-vaccination medical history is not persuasive.

First, although petitioner acknowledges her prior complaints of knee pain, she asserts that several records demonstrate that she "did not complain of joint swelling." (ECF No. 219, pp. 2-6.)  This assertion is not persuasive given the fact that she does mention "some swelling" was noted on December 15, 2008, and "minimal medial edema" was observed during her May 4, 2009 physical exam.  (*Id.* at 3.)  Moreover, in contrast to petitioner's claims that she had a "fairly stable" osteoarthritis, a review of the records shows that her right knee condition progressed over time.  During the December 15, 2008 encounter, it was noted that petitioner had a "long history of intermittent right knee pain" but that her pain had "been worse over the last month [or] so.  She has no instability or locking.  No redness, but she said she does get some swelling if she has been up on it for long periods during the day.  Sometimes, in the morning it seems more swollen also."  (Ex. 2, p. 46.)  Petitioner was diagnosed with right knee osteoarthritis and received a steroid injection in her right knee during this encounter.  (*Id.* at 47.)  Roughly five months later, on May 4, 2009, petitioner reported "knee pains daily, sitting, walking.  She feels sometimes leg gets swollen.  Pain is worse after walking."  (*Id.* at 48.)  She also now reported falling due to loss of strength.  (*Id.*)  Dr. Henkel opined that petitioner's knee pain was "likely" osteoarthritis.  (*Id.*)

Petitioner also omits any mention of her September 20, 2010 encounter, in which she continued to have lumbar complaints but she also reported new complaints of pain in her arms, legs, and neck.  (Ex. 2, p. 54.)  These new complaints mirrored petitioner's post-vaccination symptoms.  (*Compare id.* (September 20, 2010 encounter, reporting arm, leg, and neck pain), *with* Ex. 3, p. 2 (January 30, 2012 encounter, noting pain in petitioner's hands, wrists, shoulders, knees, and feet, but no joint inflammation on physical exam); Ex. 58, p. 2 (May 31, 2012 encounter, during which petitioner reported, *inter alia*, pain in her wrist, shoulders, neck, and knees), *and id.* at 62 (July 19, 2017 encounter, during which petitioner reported, *inter alia*, neck pain, bilateral elbow, pain, and bilateral knee pain).)  During the September 20, 2010 appointment, petitioner was diagnosed with polyarthralgia, and rheumatology testing was ordered (Ex. 2, pp. 55-56), though a subsequent record indicates that these tests were not obtained (*Id.* at 69).  Dr. Utz attempts to minimize the relevance of this record by emphasizing the fact that petitioner was seeking treatment for a sinusitis; that the notation of pain, particularly in the arm, is vague; and that there is no documented physical exam of the joints.  (Tr. 175-77.)  He opines that petitioner's treating physician should not have ordered the rheumatology tests given her presentation.  (*Id.* at 177-78, 440-41.)  However, petitioner's treating physician, Dr. Henkel, ordered rheumatology testing in order to diagnose and treat petitioner's new complaints of arm, leg, and neck pain, and did so with knowledge of petitioner's prior evolving history of knee pain.  Dr. Utz is not persuasive in seeking to second guess this clinical judgment.  *See Capizzano,* 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1280, and explaining that "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'"); *see also Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("Medical

records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium").  Notably, Dr. Henkel also referred back to the September 20, 2010 record when he was considering whether petitioner's post-vaccination complaints were related to the vaccine, noting in particular that petitioner "had similar complaints in the past with polyarthralgia and on 9/20/10 [work-up] was requested, those labs were not obtained at the time.  This goes against process precipitated by recent vaccination." (Ex. 2, p. 69.)

Thus, petitioner's claim that she "effectively had a mono-arthralgia" is clearly refuted by the medical records.  Moreover, Dr. Utz submits that polyarthralgia can sometimes "evolve" into rheumatoid arthritis, and that petitioner was properly diagnosed with polyarthralgia, which then ultimately evolved into RA.  (Tr. 390, 393.)  Dr. Matloubian agreed that RA can start as polyarthralgia and eventually become symptomatic with joint inflammation.  (*Id.* at 701.)  As petitioner was initially diagnosed with polyarthralgia on September 20, 2010, and the experts agree that polyarthralgia can be the first symptom of RA, then the logical conclusion is that petitioner's symptoms of RA pre-dated the September 19, 2011 vaccination.[18]  However, even if I were to consider petitioner's onset of RA symptoms occurring one-day post-vaccination, petitioner would still be unable to preponderantly establish an appropriate temporal association to the flu vaccine.

Petitioner consistently reported to medical providers that she began to experience symptoms associated with RA, including swollen joints and pain in her hands and fingers, one-day post-vaccination.  (Ex. 2, p. 72 ("Reports after [she] got flu vaccine 9/19/2011, *next day* had sore, painful swollen joints, diffusely, right side greater than left, hands/fingers, wrists, shoulders, knees, NOT Hips, feet." (emphasis added)); Ex. 3, p. 1 ("[S]he is a 59-year old woman who was in her usual state of health until October when, *on the day following the flu vaccine,* she developed generalized arthralgias, chills, headaches and dyspnea.  She also reports associated swelling in multiple joints including hands, wrists, shoulders, knees, and feet." (emphasis added)); Ex. 58, p. 2 ("She is a 60-year-old female with no significant past medical history who developed pain in multiple joints *the day after an influenza (H1N1) vaccine*." (emphasis added)).  Additionally, the VAERS report notes the date of the adverse event to be "9/20/2011," which was the day following the vaccination.  (Ex. 2, p. 64.)

Onset of RA symptoms occurring one or two days after vaccination has not been accepted as a temporally appropriate timeframe in other cases.  *See, e.g.*, *McGuinness v. Sec'y of Health & Human Servs.*, No. 17-0954V, 2021 WL 5292343, at *18-19 (Fed. Cl. Spec. Mstr. Oct. 20, 2021) (determining that onset of RA within "a few days" after vaccination was not medically appropriate under petitioner's theory of an adaptive immune response mediated by molecular mimicry); *Seivwright*, 2023 WL 3197267, at

---

[18] Petitioner has not set forth any argument that can be construed as suggesting that the subject vaccination significantly aggravated a pre-exiting condition.

35

*2-3 (concluding that a one-day onset of seronegative RA after vaccination was not medically appropriate to infer causation); *Hock*, 2020 WL 6392770, at *28-29 (determining that a one-day onset of RA symptoms was not medically appropriate under either theory of bystander activation or molecular mimicry); *Moran*, 2021 WL 4853544, at *34-35 (finding a three-day onset of RA is not a medically acceptable timeframe based on petitioner's experts' molecular mimicry theory involving a recall response to prior flu infection); *Monzon v. Sec'y of Health & Human Servs.*, No. 17-1055V, 2021 WL 2711289, at *24 (Fed. Cl. Spec. Mstr. June 2, 2021) (finding that a two-day onset of RA symptoms after the Tdap vaccine was not medically acceptable).  *But see Maxwell v. Sec'y of Health & Human Servs.*, No. 17-1367, 2025 WL 1291642, at *28 (Fed. Cl. Spec. Mstr. Mar. 26, 2025) (finding a two-day onset of RA symptoms is medically appropriate based on a theory of ongoing innate immune response, but that the causal theory was not sound or reliable).

Petitioner argues that she developed pain and swelling as a result of an innate cytokine response to the vaccine within 24 hours of her vaccination and that a secondary adaptive immune response occurred within 2-3 days of her vaccination, with RA symptom onset by September 27, 2011.  (ECF No. 219, p. 26.)  Dr. Utz testified that

> in the first 24 hours, the innate immune system led -- cytokines from the innate immune system largely were driving the initial arthralgia.  I believe that the T cell activation and bystander activation, the molecular mimicry then took place over days to weeks.  And that's what ultimately led to her arthralgia.

(Tr. 421-22.)  Thus, he suggests that petitioner's "initial arthralgia" was from the cytokines, and then the second "arthralgias a week later" were mediated by activation of T-cells.  (*Id.*)

However, Dr. Utz's explanation is purely speculative.  Petitioner's medical records do not reasonably support any parsing of the nature of petitioner's post-vaccination symptoms as between these differing mechanisms.  The medical records reflect that joint pain, swelling, and stiffness presented approximately one-day after vaccination and that those symptoms continued, ultimately leading to petitioner's diagnosis of RA.  The description of petitioner's clinical course by Dr. Grayson at the May 31, 2012 appointment is indicative of the continuous nature of petitioner's symptoms, and not a separate injury or reaction to the flu vaccine.  The record provides:

> I am seeing [petitioner] in clinic today in initial consultation for polyarthralgias over the last six months.  She is a 60-year-old female with no significant past medical history who developed pain in multiple joints the day after an influenza (H1N1) vaccine.  I do not have her medical records for review at today's visit, but reportedly she described pains in the last and small joints associated with swollen lymph nodes in the neck after the vaccination.  She sought care in her home country of Costa Rica and was given a shot of a medication that she does not recall and another shot of

> cortisone.  This reportedly was helpful.  In the United States, her primary care physician put her on prednisone 15 mg daily which provided moderate relief of joint pain.
>
> Today, she describes pain in her joints that is constant throughout the day.  She has morning stiffness lasting greater than an hour.  She describes intermittent swelling and warmth in joints.  Her pains are localized to the wrist, shoulders, neck, knee, ankles, DIP and PIP joints, Achilles tendon area, and low back.

(Ex. 58, p. 2.)  After taking her clinical history and performing an examination, Dr. Grayson diagnosed petitioner with "polyarthralgias with a clinical history strongly suggestive of inflammatory arthritis," and the differential diagnosis was "seronegative rheumatoid arthritis versus spondyloarthropathy," with Dr. Grayson favoring the diagnosis of seronegative RA.  (*Id.*)

Ultimately, petitioner's medical records reflect that her initial, nascent symptoms of RA manifested about a year prior to vaccination and that she then later developed symptoms of fulminant RA within one day of the vaccination at issue.  Petitioner has not presented preponderant evidence that this reflects a medically acceptable timeframe for the onset of seronegative RA after the flu vaccine and thus has not met her burden under *Althen* prong three.

### c.  *Althen* prong two

The Federal Circuit has cautioned that the second *Althen* prong "is not without meaning," but has also indicated that satisfaction of *Althen* prongs one and three can be probative with respect to *Althen* prong two.  *Capizzano*, 440 F.3d at 1326-27.  Nonetheless, temporal association alone is not enough to satisfy petitioner's burden of proof.  *See, e.g.*, *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal  relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom. Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *A.Y. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 588, 595 (2021); *Forrest v. Sec'y of Health & Human Servs.*, No. 10-032V, 2017 WL 4053241, at *18 (Fed. Cl. Spec. Mstr. Aug. 10, 2017); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *mot. for rev. denied*, 126 Fed. Cl. 488 (2016); *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, 2012 WL 13036266, at *37 (Fed. Cl. Spec. Mstr. June 20, 2012); *Grant*, 956 F.2d at 1148.

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records.  *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148.  In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight.  *Andreu*, 569

F.3d at 1375; *Capizzano*, 440 F.3d at 1326 (stating that "medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'" (alteration in original) (quoting *Althen*, 418 F.3d at 1280)).  However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated.  *See* § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) (stating that "there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").

Although Dr. Silva did submit a VAERS report on petitioner's behalf, a holistic review of the medical records reveals that petitioner's treating physicians did not attribute her symptoms to her vaccination.  When petitioner initially saw Dr. Henkel on September 27, 2011, he diagnosed her with "polyarthralgia" and noted that it was "unclear if symptoms are correlated with vaccination or not, possibly concomitant process.  Pt is having arthralgia with synovitis symptoms. . . . Will check ESR, r/o autoimmune process with CCP, RF, ANA.  Start naproxen for 7 days, [as needed] tramadol."  (Ex. 2, p. 69.)  Later that day, Dr. Henkel added an addendum to petitioner's record, which states: "Pt chart reviewed, pt had similar complaints in the past with polyarthralgia and on 9/10/10 w/u was requested, those labs were not obtained at the time.  This goes against process precipitated by recent vaccination."  (*Id.*)  Then, at her October 17, 2011 appointment with Dr. Silva, petitioner was diagnosed with "arthralgia and myalgia," and Dr. Silva wrote, "Acute onset polyarthritis with component of muscle pain also, mainly upper arms.  Labs unremarkable 3 weeks ago.  No history suggestive of tick illness.  Consider other viral illness, early or seroneg RA, *vaccine reaction unlikely*."  (*Id.* at 72-74 (emphasis added).)  At her first rheumatology appointment on May 31, 2012, Dr. Grayson also favored a diagnosis of seronegative RA.  (Ex. 58, p. 3.)  Although Dr. Grayson considered the relationship between the vaccine and the onset of petitioner's symptoms, he concluded that "[t]he temporal relationship is suggestive, however, there [is] not enough clinical evidence to link the vaccination with the development of rheumatoid arthritis."  (*Id.*)  Dr. Grayson's recognition of a temporal association between the onset of petitioner's symptoms and her vaccination is not evidence that he was drawing a causal connection.  *See Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1323-24 (Fed. Cir. 2010); *Isaac v. Sec'y of Health and Human Servs.*, No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012) (explaining that "[a] treating physician's recognition of a temporal relationship does not advance the analysis of causation"), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd per curiam*, 540 F. App'x 999 (Fed. Cir. 2013).  Thus, based on my review of the medical records, there is no meaningful treating physician support for petitioner's claim that the flu vaccine did cause her RA.

Instead, and especially given petitioner's failure to satisfy *Althen* prongs one and three, respondent is persuasive in arguing that

it is illogical to conclude that the flu vaccine was the reason for petitioner's RA when: 1) the cause of RA is unknown; 2) petitioner was in the peak age range (for women) for the occurrence of RA when she was diagnosed; 3) the onset of RA most often occurs over weeks to months, as it did in petitioner's case; 4) neither the influenza virus nor the flu vaccine has been recognized as a causative or triggering agent for RA; 5) the flu vaccine is recommended for patients with RA; and, 6) epidemiologic studies have shown that patients with RA respond to antigens in the flu vaccine without exacerbation of their underlying RA.

(ECF No. 212, p. 31 (citing Ex. A, pp. 5-7, 9-13; McInnes & Schett, *supra*, at Ex. A, Tab 1; Crowson et al., *supra*, at Ex. A, Tab 2, Ray et al., *supra*, at Ex. A, Tab 24, pp. 6592-93; Formin et al., *supra*, at Ex. A, Tab 28, p. 193; Tr. 592-93).)

For all these reasons, and considering the record as a whole, petitioner has not met her preponderant burden of proof under *Althen* prong two.

## VI.    Conclusion

Petitioner has my sympathy for the pain and discomfort she has endured; however, for the reasons discussed above, I find that she has not met her burden of proof.  Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation.  Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master